**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANCIENT COIN COLLECTORS GUILD,

*Plaintiff-Appellant,*

v.

U.S. CUSTOMS AND BORDER
PROTECTION, DEPARTMENT OF
HOMELAND SECURITY;
COMMISSIONER, U.S. CUSTOMS AND
BORDER PROTECTION; UNITED
STATES DEPARTMENT OF STATE;
ASSISTANT SECRETARY OF STATE,
Education and Cultural Affairs,

*Defendants-Appellees.*

No. 11-2012

AMERICAN COMMITTEE FOR
CULTURAL POLICY; ANCIENT
COINS FOR EDUCATION, INC.;
INTERNATIONAL ASSOCIATION OF
DEALERS IN ANCIENT ART;
INTERNATIONAL ASSOCIATION OF
PROFESSIONAL NUMISMATISTS;
PROFESSIONAL NUMISMATISTS GUILD,
INC.; THE AMERICAN NUMISMATIC
ASSOCIATION,

*Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:10-cv-00322-CCB)

Argued: September 19, 2012

Decided: October 22, 2012

Before WILKINSON and THACKER, Circuit Judges, and Michael F. URBANSKI, United States District Judge for the Western District of Virginia, sitting by designation.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Thacker and Judge Urbanski joined.

———————

**COUNSEL**

**ARGUED:** Peter Karl Tompa, BAILEY & EHRENBERG, PLLC, Washington, D.C., for Appellant. Samantha Lee Chaifetz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Jason Ehrenberg, BAILEY & EHRENBERG, PLLC, Washington, D.C., for Appellant. Tony West, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellees. Richard B. Rogers, RICHARD B. ROGERS PLC, Alexandria, Virginia, for American Committee for Cultural Policy and International Association of Dealers in Ancient Art, Amici Supporting Appellant. Michael McCullough, MICHAEL MCCUL-LOUGH, LLC, Brooklyn, New York, for International Association of Professional Numismatists, The American Numismatic Association, and Ancient Coins for Education, Inc., Amici Supporting Appellant. Armen R. Vartian, LAW OFFICES OF ARMEN R. VARTIAN, Manhattan Beach, California, for Professional Numismatists Guild, Inc., Amicus Supporting Appellant.

———————

**OPINION**

WILKINSON, Circuit Judge:

The Convention on Cultural Property Implementation Act ("CPIA"), 19 U.S.C. §§ 2601-2613, provides a mechanism by which foreign countries can request that the United States enact import restrictions on certain articles of cultural significance to prevent their looting and illegal sale. In challenging the seizure of coins that it attempted to import, the Ancient Coin Collectors Guild (the "Guild") asks us to engage in a searching review of the government's implementation of CPIA import restrictions on Chinese and Cypriot cultural property.

Accepting such an invitation, however, would draw the judicial system too heavily and intimately into negotiations between the Department of State and foreign countries, injecting the courts into an area of law covered by statutorily conferred executive discretion and congressional oversight. Such judicial interference would be especially problematic because Congress has already prescribed civil forfeiture as a vehicle through which importers can challenge the seizure and detention of articles allegedly covered by CPIA restrictions. Here, forfeiture proceedings were placed on hold pending the outcome of this litigation, and the Guild may still pursue various forfeiture defenses to obtain release of the articles it attempted to import. We therefore affirm the judgment of the district court.

I.

A.

In the fall of 1970, the United Nations Educational, Scientific, and Cultural Organization ("UNESCO") held a conference in Paris where its member states fashioned an international system to protect articles of cultural significance

from "the dangers of theft, clandestine excavation, and illicit export." Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property pmbl., Nov. 14, 1970, 823 U.N.T.S. 231. The product of this conference was the Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (the "Convention"). *Id.* Pursuant to Article 9 of the Convention, a "State Party" can request that other signatories take steps to protect the requesting state's cultural property from theft and illicit export, such steps to include import and/or export controls. *Id.* art. 9. The Convention defines the term "cultural property" to include an array of items "of importance for archaeology, prehistory, history, literature, art or science." *Id.* art. 1.

The U.S. Senate "unanimously gave its advice and consent to ratification in 1972," subject to several reservations, one of which indicated that the Convention was not self-executing. S. Rep. 97-564, at 21 (1982). To implement the Convention domestically, Congress passed the CPIA ten years later in 1982, and President Reagan signed it into law in 1983. Convention on Cultural Property Implementation Act, Pub. L. 97-446, tit. III, 96 Stat. 2350 (1983) (codified at 19 U.S.C. §§ 2601-2613).

B.

The CPIA allows the U.S. government to place import restrictions on designated articles of cultural property at the request of another Convention party. The process commences when a Convention party submits a written request to the United States seeking assistance in protecting its cultural property. 19 U.S.C. § 2602(a)(1), (a)(3). Upon receipt of the request, the President must "publish notification of the request . . . in the Federal Register" and submit the request and supporting statements to the Cultural Property Advisory Committee ("CPAC"). *Id.* § 2602(f).

CPAC is an eleven-member committee appointed by the President that includes representatives of museums; "experts in the fields of archaeology, anthropology, ethnology, or related areas"; "experts in the international sale of archaeological, ethnological, and other cultural property"; and representatives "of the general public." *Id.* § 2605(b)(1). CPAC reviews a request for import restrictions and issues a report to the President indicating whether such restrictions are advisable. *Id.* § 2605(f). As part of its report, CPAC must state whether: (1) "the cultural patrimony of the State Party is in jeopardy from the pillage of archaeological or ethnological materials"; (2) "the State Party has taken measures consistent with the Convention to protect its cultural patrimony"; (3) import restrictions "would be of substantial benefit in deterring a serious situation of pillage"; (4) "remedies less drastic than" import restrictions are available; and (5) import restrictions are "consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes." *Id.* § 2602(a)(1).

If, after receipt of the report, the President agrees with CPAC that import restrictions are advisable and formally determines that the aforementioned circumstances exist, he may enter into an agreement, referred to as an "Article 9 agreement" or a "memorandum of understanding," with the requesting state to apply such restrictions. *Id.* § 2602(a), (f). The President must then provide to Congress the text of the agreement and a description of the import restrictions imposed. *Id.* § 2602(g). If the President disagrees with the CPAC recommendation and takes a different action or takes no action at all, he must submit a report to Congress indicating the reasons for his deviation from the CPAC recommendation. *Id.*

The scope of import restrictions enacted pursuant to the CPIA is limited by § 2601. Most relevant here, the statute limits import restrictions to "archaeological or ethnological

material of the State Party" and defines that term to mean any object of archaeological or ethnological interest that "was first discovered within, and is subject to export control by, the State Party" requesting import restrictions. *Id.* § 2601(2). The Secretary of the Treasury—who was responsible for U.S. Customs at the time the CPIA was enacted—can promulgate regulations that list restricted articles "by type or other appropriate classification," so long as "each listing made . . . shall be sufficiently specific and precise to insure that (1) the import restrictions . . . are applied only to the archaeological and ethnological material covered by the agreement" and "(2) fair notice is given to importers and other persons as to what material is subject to such restrictions." *Id.* § 2604. Any article that meets the aforementioned definition of "archaeological or ethnological material of the State Party" may be restricted.

Although the statute confers CPIA functions upon the President and the Secretary of the Treasury, government reorganizations and various delegations of authority now leave CPIA authority in the hands of the Assistant Secretary of State for Educational and Cultural Affairs (the "Assistant Secretary") and U.S. Customs and Border Protection ("CBP"). *E.g.*, Exec. Order 12,555; 68 Fed. Reg. 10,627; 65 Fed. Reg. 53,795. The Assistant Secretary, an officer of the U.S. Department of State ("State"), is responsible for communicating with other parties to the Convention and for filing the necessary determinations and reports, 65 Fed. Reg. 53,795, and CBP, a unit of the U.S. Department of Homeland Security, is responsible for promulgating regulations that enact appropriate import restrictions, Exec. Order 12,555; 68 Fed. Reg. 10,627. CBP also enforces the restrictions at ports of entry. 19 C.F.R. § 12.104i.

If an article is covered by CPIA import restrictions, it may not be brought into the United States unless (1) it is accompanied by formal documentation certifying that it was lawfully exported from the country that has requested the import restrictions, 19 U.S.C. § 2606(a); (2) there is "satisfactory evi-

dence" that the article was exported from the State Party at least ten years before it arrived in the United States and the importer owned it for less than one year before it arrived in the United States, *id.* § 2606(b)(2)(A); or (3) there is "satisfactory evidence" that the article was exported from the State Party before the import restrictions took effect, *id.* § 2606(b)(2)(B). Section 2606 defines "satisfactory evidence" to include a "declaration[] under oath by the importer, or the person for whose account the material is imported, stating that, to the best of his knowledge," the article is eligible for import under one of the aforementioned exemptions. *Id.* § 2606(c). If the date of export from the State Party is not known, a statement expressing "belief" that the article meets one of the exemptions may suffice. *Id.* § 2606(c)(1)(B), (c)(2)(B).

If, at the port of entry, CBP officers initially determine that an article is not eligible for import into the United States, they may seize the article. 19 U.S.C. § 2609(a). If the importer fails to subsequently demonstrate that the article may be lawfully imported, CBP may then refer the matter to the United States Attorney's Office to commence a forfeiture action. 19 U.S.C. §§ 1610, 2609. While the CPIA imposes no requirement that the government commence forfeiture proceedings, the Fifth Amendment Due Process Clause does impose such a requirement. *See Degen v. United States*, 517 U.S. 820, 822 (1996).

## C.

### 1.

In September 1998, Cyprus formally requested that the United States impose import restrictions on "certain categories of archaeological and/or ethnological material the pillage of which, it is alleged, jeopardizes the national cultural patrimony of Cyprus." 63 Fed. Reg. 49,154. The United States Information Agency ("USIA"), at that time responsible for

taking action under the CPIA, Exec. Order 12,555, promptly published notice of the Cypriot request in the Federal Register and referred the matter to CPAC for review, 63 Fed. Reg. 49,154-55. The emergency provisions of the CPIA allow for the application of import restrictions on a temporary basis while the United States and the requesting state negotiate a permanent agreement under the standard CPIA framework. 19 U.S.C. § 2603. Finding the situation in Cyprus to be an urgent one, CPAC recommended that the United States apply emergency import restrictions on certain archaeological and ethnological articles from Cyprus. 64 Fed. Reg. 17,530. In 1999, USIA formally determined such action was necessary, and the U.S. Customs Service then imposed the restrictions. *Id.* No coins appeared on the initial list of restricted items. *Id.* at 17,530-31.

In 2002, the United States and Cyprus signed an Article 9 agreement under the standard, non-emergency provisions of the CPIA. 67 Fed. Reg. 47,447. This agreement was amended in 2006, 71 Fed. Reg. 51,724-25, and extended via diplomatic note in 2007, 72 Fed. Reg. 38,470-71. The Assistant Secretary published notice of the proposed extension in the Federal Register, 71 Fed. Reg. 71,015-16, and she "review[ed] the findings and recommendations" of CPAC in concluding that the amendment and extension were necessary. 72 Fed. Reg. 38,471. Following the 2007 extension, CBP promulgated an amended list of articles subject to import restrictions. *Id.* at 38,471-73. This list did include certain "Coins of Cypriot Types," and restrictions on these coins took effect shortly after the list was published in the Federal Register. *Id.* at 38,473.

2.

In May 2004, China formally requested that the United States impose import restrictions on a number of categories of "Chinese archaeological material from the Paleolithic to the Qing Dynasty." 69 Fed. Reg. 53,970. The Assistant Secretary

promptly published notice of the request in the Federal Register, *id.*, and referred the request to CPAC for review. CPAC recommended imposing import restrictions. Upon receipt of the CPAC report, the Assistant Secretary formally determined that import restrictions were justified under the CPIA, and in January 2009, the United States and China entered into an Article 9 agreement to restrict import of the cultural property under consideration. 74 Fed. Reg. 2,839. Several days after the agreement was concluded, CBP promulgated a list of articles subject to CPIA restrictions, including certain coins of Chinese types. *Id.* at 2,842. Restrictions on these coins took effect shortly after the list was published in the Federal Register. *Id.* at 2,839.

### D.

In April 2009, after the aforementioned import restrictions had taken effect, the Guild purchased twenty-three ancient Chinese and Cypriot coins from a numismatic dealer in London. According to documentation provided by the dealer, "each coin was minted in Cyprus or China"; "each coin had no recorded provenance"; and for each coin, the "find spot" was "unknown." *Ancient Coin Collectors Guild ("ACCG") v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 394 (D. Md. 2011) (internal quotation marks omitted).

On April 15, 2009, the Guild attempted to bring the coins into the United States via air cargo. CBP detained the coins for alleged violations of the CPIA and associated regulations and indicated that the coins would be released if the Guild provided evidence that each was either (1) lawfully exported from its respective state while CPIA restrictions were in effect; (2) exported from its respective state more than ten years before it arrived in the United States; or (3) exported from its respective state before CPIA restrictions went into effect. However, (and perhaps in an effort to establish a test case), the Guild declined to provide CBP with the necessary documentation.

After waiting several months for the government to institute forfeiture proceedings, the Guild brought this action against, *inter alia*, U.S. Customs and Border Protection and the U.S. Department of State, alleging that the actions of both agencies were *ultra vires*, in violation of the Administrative Procedure Act, and in violation of the First and Fifth Amendments to the United States Constitution. Following a hearing, the district court granted in full the government's motion to dismiss.

The court dismissed the APA claims against State, holding that State was not an "agency" for purposes of the APA because, in making the challenged decisions that established the relevant import restrictions, it was acting as the President's delegee and exercising power expressly granted to the President by statute. The court also dismissed the APA claims against CBP, holding that CBP merely complied with valid regulations promulgated at the behest of State.

As to the *ultra vires* claims, the court held that neither State nor CBP exceeded its authority under the CPIA or any other relevant statute. The constitutional claims were also held to be without merit: the government's delay in instituting forfeiture proceedings did not constitute a violation of due process, and "even assuming without deciding that the inscriptions on ancient coins constitute expression [under the First Amendment], the import restrictions satisfy the requirements of *United States v. O'Brien*, 391 U.S. 367 (1968)." *ACCG*, 801 F. Supp. 2d at 411. This appeal followed.

## II.

The Guild asks this court to engage in a searching review of the State Department's conclusions that (1) import restrictions on coins were requested by China and Cyprus, (2) the restricted articles were part of each state's respective cultural patrimony, and (3) the restrictions were necessary to protect each state's respective cultural patrimony. As outlined above,

Congress set out an elaborate statutory scheme for promulgating import restrictions on culturally sensitive items and gave the Executive Branch broad discretion in negotiating Article 9 agreements with foreign states. *See* 19 U.S.C. § 2602(a). Congress itself retained oversight of the CPIA process, *id.* § 2602(g), and placed significant responsibility in the hands of CPAC, a body composed of experts in the fields of archaeology and ethnology, *id.* § 2605. Congress also provided forfeiture procedures through which importers could challenge any seizures made pursuant to the CPIA. *Id.* § 2609.

The conclusions to be drawn from the entirety of this statutory scheme are clear. The federal judiciary has not been generally empowered to second-guess the Executive Branch in its negotiations with other nations over matters of great importance to their cultural heritage, to overrule CPAC in its conclusion that import restrictions on coins were necessary to protect the cultural patrimonies of Cyprus and China, or to challenge Congress in its decision to channel CPIA disputes through forfeiture proceedings. Mindful of the deference owed the political branches under the statute, we consider the Guild's arguments.

A.

The Guild contends that the State Department acted *ultra vires* when it imposed import restrictions on certain Cypriot and Chinese coins. Our review under the *ultra vires* standard is necessarily narrow. We may not dictate how government goes about its business but only whether a public entity "has acted within the bounds of its authority or overstepped them." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2010) (Brown, J., concurring in the judgment). Government action is *ultra vires* if the agency or other government entity "is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949); *see also U.S.*

*Dep't of Interior v. 16.03 Acres of Land*, 26 F.3d 349, 355 (2d Cir. 1994).

The statute, as noted, involves a sensitive area of foreign affairs where Congress itself has delegated the Executive Branch significant discretion. Given that approach, a searching substantive review of the State Department's diplomatic negotiations or CPAC's application of its archaeological expertise would be singularly inappropriate in this forum. And the record itself leaves no room for an *ultra vires* challenge on any other basis.

As the district court noted, there is no question that the State Department complied with CPIA procedures when it placed import restrictions on Chinese coins:

- In May 2004, China formally requested that the United States impose import restrictions on certain categories of cultural property. 69 Fed. Reg. 53,970.

- The Assistant Secretary promptly published notice of the request in the Federal Register, *id.*, and published a public summary of the request on the State Department's website.

- The Assistant Secretary referred the Chinese request to CPAC, and CPAC issued a report recommending import restrictions on certain categories of Chinese cultural property. *ACCG*, 801 F. Supp. 2d at 393.

- Based on CPAC's report, the Assistant Secretary determined that: (1) "the cultural patrimony of China is in jeopardy from the pillage of irreplaceable archaeological materials representing China's cultural heritage"; (2) "the Chinese government has taken measures consistent with the

Convention to protect its cultural patrimony"; (3) "import restrictions imposed by the United States would be of substantial benefit in deterring a serious situation of pillage and remedies less drastic are not available"; and (4) "the application of import restrictions . . . is consistent with the general interests of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes." 74 Fed. Reg. 2,839.

- The Assistant Secretary followed CPAC's recommendation, and the United States concluded an Article 9 agreement with China in January 2009. *Id.*

- The Assistant Secretary reported to Congress the text of the agreement and a description of the import restrictions to be imposed under it.

- CBP published in the Federal Register a list of items subject to CPIA import restrictions, including coins of certain Chinese types. *Id.* at 2,839-43.

Before CBP enforced any import restrictions on Chinese coins, each of the CPIA's requirements was satisfied with respect to those coins. The district court similarly found that the State Department complied with the statutory requirements in placing import restrictions on Cypriot coins.

### B.

Notwithstanding the above, the Guild argues that the State Department and CBP ran off the rails by enacting import restrictions on Chinese coins without following the procedures required by the CPIA. The Guild alleges two distinct violations of the statute. First, the Guild argues that the State

Department imposed restrictions on Chinese coins even though China did not mention coins in its May 2004 request. In making this argument, however, the Guild seeks to add a provision to the statute that is simply not there, namely a requirement that a request under Article 9 include "a detailed accounting of every item eventually covered by an Article 9 agreement." *ACCG*, 801 F. Supp. 2d at 410.

The CPIA requires that a State Party (here China) formally request assistance from the United States in protecting its cultural patrimony, 19 U.S.C § 2602(a)(1), (a)(3), but the request need not include a comprehensive list of all the items that might later be found appropriate for inclusion in a negotiated Article 9 agreement. Were the federal judiciary to require a State Party to include such a list, we would be placing burdens that Congress nowhere mentioned upon China, Cyprus, and every other foreign country that sought this country's assistance in protecting its own cultural heritage. We would be drawn into preliminary negotiations between the State Department and foreign countries in a far more detailed manner than the CPIA contemplated. This is the very intervention into sensitive diplomatic matters that we have earlier emphasized is not permissible, and we decline to require from China more than the statute itself does.

Second, the Guild contends that the State Department's notice in the Federal Register was defective because it did not mention that China requested restrictions on coins. Once again, the Guild effectively seeks to have us impose a requirement that does not appear in the CPIA, this time that the State Department "publish verbatim the list of items requested to be restricted." *ACCG*, 801 F. Supp. 2d at 410.

The statute merely requires that the State Department publish "notification of the request" in the Federal Register, 19 U.S.C. § 2602(f)(1), not an exhaustive description of its terms. To scrutinize the adequacy of the State Department's publication and require a verbatim publication of a foreign

request would involve the judiciary in the very early stages of the CPIA process and place upon the State Department a burden that Congress did not intend. Requiring the Department of State to reveal every detail of a request made by a foreign government through confidential diplomatic channels runs afoul of the admonition that such revelations may "compromise the Government's negotiating objectives or bargaining positions on the negotiations of any agreement authorized by [the CPIA]." 19 U.S.C. § 2605(h). Because Congress required that the Department of State simply publish "notification of the request" by a State Party, we decline to accept the Guild's suggestion that we require more from State Department's notice in the Federal Register.

In sum, each of the Guild's arguments with respect to State's procedural compliance would have us add encumbrances to the CPIA, ultimately placing additional burdens on foreign governments and State Department officials negotiating Article 9 agreements with those governments. It is true that at the conclusion of negotiations and upon the reaching of an Article 9 agreement with the foreign government in question, CBP must publish a list of import restrictions by type in the Federal Register. *Id.* § 2604. CBP complied with that requirement here. 74 Fed. Reg. 2,839-2,842. But the detail required by the statute at the conclusion of the process is altogether different from the level of detail required before negotiations between our country and another nation have even so much as begun.

Congress sought to strike a balance here between the need for notice and transparency on the one hand, and the need for confidentiality in sensitive matters of diplomacy on the other. Likewise in balance is the aim of having the CPIA process move forward with some modicum of efficiency while still providing both proper notice of the restrictions and procedural recourse for those who are subject to them. It is clear that deviation from the provisions of the statute runs every risk of throwing this balance out of kilter in an area where traditional

competencies and constitutional allocations of authority have counseled reluctance on the part of the judiciary to intervene. The Guild asks us to do just that, and we decline its invitation.

C.

Section 2601 narrows the universe of articles that may be subjected to import restrictions under the CPIA. Only an object of archaeological or ethnological interest "which was first discovered within, and is subject to export control by" the requesting state may be restricted. 19 U.S.C. § 2601(2). The Guild alleges that State and CBP acted *ultra vires* by placing import restrictions on all coins of certain types without demonstrating that all coins of those types were "first discovered within" China or Cyprus. Guild Br. at 21-22. According to the Guild, the government and the district court effectively read the "first discovered" requirement out of the statute. *Id.* at 24.

We are not persuaded. As an initial matter, the CPIA is clear that defendants may designate items by "type or other appropriate classification" when establishing import restrictions. 19 U.S.C. § 2604. State and CBP are under no obligation to list restricted items with more specificity than the statute commands, and they are certainly not required to impose restrictions on a coin-by-coin basis. Such a requirement would make the statutory scheme utterly unworkable in practice.

Here, CBP published detailed lists of restricted types from both China and Cyprus. The requests categorize the restricted articles by material (e.g., "Bronze," "Iron"), then by category (e.g., "Coins," "Sculpture"), then by time period, and finally by specific "type." *E.g.*, 74 Fed. Reg. 2,842; 72 Fed. Reg. 38,473. One Cypriot coin type, for example, was described as follows: "III. Metal, D. Coins of Cypriot Types, 3. Provincial and local issues of the Roman period from c. 30 B.C. to 235 A.D. Often these have a bust or head on one side and the image of a temple (the temple of Aphrodite at Palaipaphos) or

statue (statue of Zeus Salaminios) on the other." 72 Fed. Reg. 38,472-73.

CPAC and the Assistant Secretary did consider where the restricted types may generally be found as part of the review of the Chinese and Cypriot requests. CBP listed the articles in question in the Federal Register by "type" –- but only after State and CPAC had determined that each type was part of the respective cultural patrimonies of China and Cyprus. 74 Fed. Reg. 2,839-42 (Chinese coins); 72 Fed. Reg. 38,470-73 (Cypriot coins). Among the members of CPAC are three "experts in the fields of archaeology, anthropology, ethnology, or related areas" and three "experts in the international sale of archaeological, ethnological, and other cultural property." 19 U.S.C. § 2605(b)(1). Plaintiffs have given us no reason to question CPAC's conclusion, as adopted by State, as to where the types of cultural property at issue were discovered. To the contrary, it was hardly illogical for CPAC to conclude that, absent evidence suggesting otherwise, Chinese and Cypriot coins were first discovered in those two countries and form part of each nation's cultural heritage.

As the district court noted, "the CPIA anticipates that there may be some archaeological objects without precisely documented provenance and export records." *ACCG*, 801 F. Supp. 2d at 408. In those cases, the statute expressly provides that CBP may seize the articles at the border: "If the [importer] of any designated archaeological or ethnological material is unable to present to the customs officer" the required documentation, the "officer concerned shall refuse to release the material from customs custody . . . until such documentation or evidence is filed with such officer." 19 U.S.C. § 2606(b). In short, CBP need not demonstrate that the articles are restricted; rather, the statute "expressly places the burden on importers to prove that they are importable." *ACCG*, 801 F. Supp. 2d at 408.

This conclusion is borne out by § 2606, which states that once archaeological or ethnological material has been desig-

nated by "type" and included in the list of restricted articles, it may not be imported into the United States without specific documentation showing that it is eligible for import. 19 U.S.C. § 2606. Such documentation must show that the article in question was either (1) lawfully exported from its respective state while CPIA restrictions were in effect; (2) exported from its respective state more than ten years before it arrived in the United States; or (3) exported from its respective state before CPIA restrictions went into effect. *Id.* In other words, the importer need not document every movement of its articles since ancient times. It need demonstrate only that the articles left the country that has requested import restrictions before those restrictions went into effect or more than ten years before the date of import.

Here, CBP has listed the Chinese and Cypriot coins by type, in accordance with 19 U.S.C. § 2604, and CBP has detained them, in accordance with 19 U.S.C. § 2606. The detention was lawful as an initial matter, and the Guild had an opportunity at the time of detention to present evidence that the coins were subject to one of the CPIA exemptions. *See id.* As explained above, the Guild need not have documented every movement of its coins since ancient times. To comply with § 2606, the Guild need demonstrate only that the Cypriot coins left Cyprus prior to 2007 and that the Chinese coins left China prior to 2009. *See id.* It never so much as attempted to do so.

### III.

We now turn to the Guild's claims under the Administrative Procedure Act. The Guild alleges that State violated the APA by, *inter alia*, making decisions influenced by "bias and/or prejudgment and/or *ex parte* contact." Am. Compl. ¶ 135; *see also ACCG*, 801 F. Supp. 2d at 401. It also alleges that CBP violated the APA by promulgating import restrictions on Cypriot and Chinese coins and by seizing those coins despite the fact that they were not covered by the CPIA. Am.

Compl. ¶ 102, 117; *see also ACCG*, 801 F. Supp. 2d at 413-14.

The district court held that the APA did not apply to State's actions because State was acting at the behest of the President and was therefore not an "agency" for APA purposes. *ACCG*, 801 F. Supp. 2d at 403-04. On appeal, the government argues that even if State were an "agency," the APA's provisions would still not apply to it because agency action on behalf of the President in foreign affairs is covered by the exemption for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111-12 (1948); *see also Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975).

We have emphasized throughout the restricted scope of judicial review when it comes to the statutory discretion Congress has conferred upon the Executive Branch in carrying out the international obligations of the United States under the Convention. These cautions are nowhere more pertinent than where this nation's protection and recognition of another's cultural patrimony is involved. Congress recognized that the CPIA "is important to our foreign relations, including our international cultural relations," and it enacted the statute to ensure that the United States did not become an illegal market for foreign cultural property, a development that would have "severely strain[ed] our relations with the countries of origin, which often include close allies." S. Rep. 97-564, at 23 (1982).

The standard for review under the APA is a familiar one: a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. Under the APA, the scope of our review is narrow, and we may not "substitute [our own] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Even were we to assume that State was fully subject to the APA, none of its actions were remotely arbitrary or capricious.

Here, Congress laid out specific procedures for State to follow in concluding Article 9 agreements and imposing import restrictions on covered articles. As discussed above, the Department of State fulfilled each of those statutory requirements and, in doing so, put the Guild on notice that import restrictions were in effect. For the reasons set forth at length in the previous section, the governmental actions challenged herein did not run afoul of any APA standard or otherwise transgress enacted law.

We also agree with the district court that CBP did not violate the APA because it merely promulgated regulations at the behest of State and in full compliance with the CPIA. *See ACCG*, 801 F. Supp. 2d at 413-14. When CBP received instructions from State to promulgate the regulations, it was entirely reasonable for CBP to follow those instructions, given its statutory obligation to do so. 19 U.S.C. § 2612 (indicating that CBP "*shall* prescribe such rules and regulations as are necessary and appropriate to carry out the provisions of [the CPIA]" (emphasis added)).

Congress did not provide comprehensive instruction on how to convert the terms of an Article 9 agreement into CBP regulations. If Congress is dissatisfied with the method of conversion, or for that matter with any aspect of the CPIA process, it has only to amend the law. For though Congress channeled plaintiffs' particularized challenges toward forfeiture proceedings, it retained significant oversight authority of its own to ensure that State and CBP are complying with the statute. *See id.* § 2602(g) (requiring the President to "submit a report to Congress" describing any actions taken under the CPIA and any deviations from CPAC's recommendations). If Congress disapproves of State's decisions, corrective mechanisms are available: Congress can hold hearings on State's

actions, request documents from State, or reassess appropriations to the responsible parties. But reformation of the statute does not lie with this proceeding.*

## IV.

It may fairly be acknowledged that the Guild and its supporting amici are not without a point. Coins are portable objects. They are minted in the main to be circulated. Although rare specimens may remain largely in the hands of collectors, restrictions on "the antiquities market" risk the impairment of "a medium of cultural exchange and education." *See* Br. for Am. Comm. for Cultural Policy & Int'l Ass'n of Dealers in Ancient Art as *Amici Curiae* at 1.

But that is not the whole story. The often worn and mysterious beauty of ancient coins renders them invaluable cultural artifacts, helpful not only in dating archaeological finds but in revealing how distant civilizations once conducted their civic and commercial life. Whether coins (or sculptures or pottery) should be exempted from coverage as cultural property presents a lively policy debate, but the tension is resolved for us through the medium of law. The definition of covered properties is general in character, *see* 19 U.S.C. § 2601(2) (defining

---

*The Guild also argues that the restrictions herein challenged violate the First Amendment. We find this claim to be without merit for the reasons set forth by the district court. *See ACCG*, 801 F. Supp. 2d at 411-12. As that court noted, "the imposition of import restrictions is within the constitutional power of the Government"; the restrictions "further an important or substantial governmental interest, namely combating the pillage of archaeological or ethnological materials where that pillage, and the resulting illegal trade, threatens the cultural patrimony of other countries"; "the government's interest in combating the pillage of archaeological materials is unrelated to the suppression of free expression"; and the statute's exceptions and exemptions reveal a narrowly tailored law where any "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the government's interest in combating the pillage of protected materials." *Id.*

"archaeological or ethnological material of the State Party"), and it is not within our province to denote discrete exceptions.

We emphasize that our decision does not leave the Guild without a remedy. At oral argument and in its brief, the government represented that it will bring a forfeiture action under the statutory scheme once this litigation has concluded, Gov't Br. at 43. There, it hardly need be said, the basics of due process require that the Guild be given a chance to contest the government's detention of its property.

In a timely forfeiture proceeding, the Guild can press a particularized challenge to the government's assertion that the twenty-three coins are covered by import restrictions. Under the CPIA, the government bears the initial burden in forfeiture of establishing that the coins have been "listed in accordance with section 2604," 19 U.S.C. § 2610, which is to say that they have been listed "by type or other appropriate classification" in a manner that gives "fair notice . . . to importers," *id.* § 2604. If the government meets its burden, the Guild must then demonstrate that its coins are not subject to forfeiture in order to prevail. *See id.* § 1615.

We obviously express no view on how the forfeiture process will unfold. We simply conclude that this suit seeks to have the judiciary assume a role that the statute does not intend for us to assume. We have reviewed the Guild's various claims and find them to be without merit. The district court faithfully interpreted the CPIA, and its judgment is affirmed.

*AFFIRMED*