**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1625**

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ANCIENT COIN COLLECTORS GUILD,

Claimant - Appellant,

v.

3 KNIFE-SHAPED COINS; 7 CYPRIOT COINS; 5 OTHER CHINESE COINS,

Defendants.

------------------------------

PROFESSIONAL NUMISMATISTS GUILD, INC; AMERICAN NUMISMATIC ASSOCIATION; INTERNATIONAL ASSOCIATION OF PROFESSIONAL NUMISMATISTS; ASSOCIATION OF DEALERS AND COLLECTORS OF ANCIENT AND ETHNOGRAPHIC ART; COMMITTEE FOR CULTURAL POLICY, INC.; GLOBAL HERITAGE ALLIANCE,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:13-cv-01183-CCB)

Argued: March 22, 2018                    Decided: August 7, 2018

Before KING, AGEE, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Agee and Judge Thacker joined.

---

**ARGUED:** Peter Karl Tompa, BAILEY & EHRENBERG, PLLC, Washington, D.C., for Appellant. Molissa Heather Farber, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Jason H. Ehrenberg, BAILEY & EHRENBERG, PLLC, Washington, D.C., for Appellant. Stephen M. Schenning, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. Armen R. Vartian, LAW OFFICES OF ARMEN R. VARTIAN, Manhattan Beach, California, for Amici Professional Numismatists Guild, Inc., American Numismatic Association, and International Association of Professional Numismatists. Michael McCullough, MICHAEL MCCULLOUGH LLC, Brooklyn, New York, for Amici Association of Dealers and Collectors of Ancient and Ethnographic Art, Committee for Cultural Policy, Inc., and Global Heritage Alliance.

---

KING, Circuit Judge:

This appeal is pursued by the Ancient Coin Collectors Guild (the "Guild") from the judgment in the District of Maryland ordering forfeiture to the United States of seven ancient Cypriot coins and eight ancient Chinese coins, which were imported into this country by the Guild. Incorporated within its challenge to the propriety of the district court's summary judgment decision, the Guild contests the court's treatment of the Guild's expert evidence, the striking of one of its pleadings, and the denial of its requests for additional discovery. As explained below, we reject each of the contentions of error, including several that are foreclosed by our previous decision in *Ancient Coin Collectors Guild v. U.S. Customs and Border Protection,* 698 F.3d 171 (4th Cir. 2012) ("*Ancient Coin I*"). Accordingly, we affirm the judgment.

I.

A.

1.

On November 14, 1970, the United States became a signatory, i.e., a State Party, to an international treaty developed primarily by the United Nations — the Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership and Cultural Property (the "Treaty"). *See* 823 U.N.T.S. 231. The Treaty was designed to eradicate the clandestine excavation and illicit trade of "cultural property," that is, property "specifically designated by each State [Party] as being of importance for archaeology, prehistory, history, literature, art or science." *Id.* art. 1(e). Cultural

3

property includes "antiquities more than one hundred years old, such as . . . coins." *Id.*

Article 9 of the Treaty provides that when a State Party determines that its "cultural patrimony is in jeopardy," it may call upon other State Parties to take action, including through the imposition of import restrictions. *Id.* art. 9.

In 1983, Congress enacted a public law entitled the Convention on Cultural Property Implementation Act (the "CPIA"), which formally implemented the Treaty. *See* Pub. L. No. 97-446, 96 Stat. 2350 (1983) (codified at 19 U.S.C. §§ 2601-2613). Pursuant thereto, if another State Party wants the United States to impose import restrictions on its cultural property, that State Party first must make a formal written request. *See* 19 U.S.C. § 2602(a)(3). By that request, the State Party must claim, inter alia, that its cultural patrimony is in jeopardy, that the imposition of import restrictions would deter "a serious situation of pillage," and that "less dramatic" alternatives are unavailable. *Id.* § 2602(a)(1)(A)-(C). After publishing notice of the request but prior to any further action, the CPIA requires the President to forward the State Party's request to a statutory committee — the Cultural Property Advisory Committee ("CPAC" or the "Committee") — for review and recommendations. *Id.* § 2602(f)(1)-(2).[1]

CPAC is an eleven-member Committee appointed by the President and comprised of experts and stakeholders in "the international exchange of archaeological and ethnological materials." *See* 19 U.S.C. § 2605(b)(2)(A). Upon receiving notice of a

_____

[1] Although the CPIA explicitly vests the President with a number of responsibilities arising thereunder, the President has delegated much of that authority to the Department of State. *See* Exec. Order No. 12555, 51 Fed. Reg. 8475 (Mar. 10, 1986).

4

State Party's request to impose import restrictions, the Committee is required to conduct an investigation and prepare a report detailing whether import restrictions are warranted. *Id.* § 2605(f)(1). The report must be detailed, specifying by type or classification the materials that should be subjected to import restrictions. *Id.* § 2605(f)(4)(B).

The President is required to consider the CPAC report before taking any action on a State Party's request. *See* 19 U.S.C. § 2602(f)(3). If the President is then convinced that import restrictions are warranted, he can enter into an agreement — called a Memorandum of Understanding (an "MOU") — restricting the importation of "archaeological or ethnological materials of the State Party." *Id.* § 2602(a)-(b). As relevant here, the CPIA defines the term "archaeological or ethnological material of the State Party" as an object of archaeological or ethnological interest, or any fragment or part thereof, "which was first discovered within, and is subject to export control by, the State Party." *Id.* § 2601(2).

After entering into an MOU, the CPIA requires the President to report to Congress, notifying it of the President's action. *See* 19 U.S.C. § 2602(g)(1)-(2). The President's report to Congress should explain "the differences (if any) between such action and the views and recommendations contained in any [CPAC] report," and provide "the reasons for any such difference." *Id.* § 2602(g)(2).

2.

Upon the President's agreement to an MOU, the Secretary of Homeland Security, in consultation with the Secretary of State, is obliged to promulgate a regulation — or "designated list" — identifying the archaeological or ethnological materials covered by

5

the MOU. *See* 19 U.S.C. § 2604.[2] Restricted materials may be listed therein "by type or other appropriate classification." *Id.* Each designated list, however, must be "sufficiently specific and precise" to ensure that (1) "the import restrictions . . . are applied only to the archaeological and ethnological material covered by the [MOU]" and (2) "fair notice is given to importers . . . as to what material is subject to such restrictions." *Id.*

Section 2606 of Title 19 governs the enforcement of the import restrictions contained in the designated lists that have been promulgated. Pursuant thereto, it is unlawful to import "designated archaeological or ethnological material that is exported (whether or not such exportation is to the United States) from the State Party after the designation of such material under section 2604." *See* 19 U.S.C. § 2606(a). "Designated archaeological or ethnological material" is a term of art in the CPIA, and is not to be confused with the term "archaeological or ethnological material of the State Party." *Compare* 19 U.S.C. § 2601(2) (defining "archaeological or ethnological material"), *with* 19 U.S.C. § 2601(7) (defining "designated archaeological or ethnological material"). As relevant here, designated archaeological or ethnological material includes "any

---

[2] When the CPIA was adopted, the Department of the Treasury was responsible for promulgating regulations governing compliance with Article 9. *See* Convention on Cultural Property Implementation Act, Pub. L. No. 97-446, §§ 302(8), 305, 96 Stat. 2350, 2351, 2355 (1983) (codified at 19 U.S.C. §§ 2601(8), 2604). In 2003, however, the Secretary of the Treasury issued a directive delegating that authority to the Department of Homeland Security. *See* Delegations of Authority, 68 Fed. Reg. 51,868 (Aug. 28, 2003). The Department of Homeland Security now carries out those responsibilities through one of its agencies, Customs and Border Protection.

6

archaeological . . . material of the State Party" which is "covered by an [MOU]" and "listed by regulation under section 2604." *Id.* § 2601(7).

The CPIA authorizes the importation of designated archaeological or ethnological material into the United States, but only when the importer can satisfy — at the time of entry — at least one of three evidentiary requirements. *See* 19 U.S.C. § 2606(b). First, under § 2606(b)(1), the importer can present to Customs and Border Protection ("Customs") a "certificate or other documentation" from the State Party that requested the restrictions, certifying that the designated material was exported in compliance with that State Party's laws.[3] Second, pursuant to § 2606(b)(2)(A), the importer can present Customs with "satisfactory evidence" demonstrating that the designated material was exported from the State Party at least ten years before it arrived in the United States.[4] Third, under § 2606(b)(2)(B), the importer can present "satisfactory evidence" to Customs proving that the designated material was exported from the State Party "on or before the date" the material became subject to import restrictions. Under the second and third requirements, that is, pursuant to § 2606(b)(2)(A) and § 2606(b)(2)(B), the term "satisfactory evidence" means a declaration from the importer, plus a statement from the

---

[3] Section 2606(a) defines the "certificate or other documentation" required under § 2606(b)(1). Pursuant thereto, designated archaeological or ethnological material cannot be imported into the United States "unless the State Party issues a certification or other documentation which certifies that such exportation was not in violation of the laws of the State Party." *See* 19 U.S.C. § 2606(a).

[4] Section 2606(b)(2)(A) also requires the importer to present "satisfactory evidence" that the importer did not "acquire[] an interest, directly or indirectly, in such material more than one year before the date of entry."

7

seller, attesting that the designated material was imported in compliance with one of those two provisions. *Id.* § 2606(c)(1)-(2).[5]

If an importer fails to submit any of the documentation specified in § 2606 when designated material enters the United States, Customs officials are directed to "refuse to release the material from customs custody." *See* 19 U.S.C. § 2606(b). The importer then has ninety days to file with Customs either the required certificate or satisfactory evidence demonstrating that the designated material was lawfully exported from the State Party. *Id.* If the importer fails to do so, the designated material is subject to seizure and forfeiture to the United States. *Id.* § 2609(b).

---

[5] The "satisfactory evidence" requirement of § 2606(b)(2)(A) has three components. First, it requires a declaration by the importer stating that, to the best of his knowledge, "the material was exported from the State Party not less than ten years before the date of entry into the United States." *See* 19 U.S.C. § 2606(c)(1)(A)(i). Second, the importer must submit a declaration stating that he did not acquire an interest in the designated material "more than one year before the date of entry of the material." *Id.* § 2606(c)(1)(A)(ii). Third, the individual who sold the material must provide a statement identifying "the date, or, if not known, his belief, that the material was exported from the State Party not less than ten years before the date of entry into the United States, and the reasons on which the statement is based." *Id.* § 2606(c)(1)(B).

On the other hand, § 2606(b)(2)(B)'s "satisfactory evidence" requirement has only two components. First, the importer must submit a declaration which states that, to the best of his knowledge, "the material was exported from the State Party on or before the date such material was designated under [section 2604]." *See* 19 U.S.C. § 2606(c)(2)(A). Second, the individual that sold the designated material must submit a statement which identifies the "date, or if not known, his belief, that the material was exported from the State Party on or before the date such material was designated under [section 2604], and the reasons on which the statement is based." *Id.* § 2606(c)(2)(B).

8

B.

1.

The Guild is a non-profit organization dedicated to protecting the interests of numismatists, particularly those individuals who specialize in the collection of ancient coins.[6] The Guild's director, Wayne Sayles, founded the organization in 2004 in an effort to preempt the imposition of CPIA restrictions on ancient coins. Sayles and the Guild opposed such restrictions for two primary reasons. First, they rejected the notion that coins should be considered part of a country's cultural patrimony. More specifically, they read the CPIA to limit the concept of cultural patrimony to those items "first discovered within" a particular State Party's borders. *See* 19 U.S.C. § 2601(2). Because most ancient coins have no known locus of discovery — also called a "find spot" — and many coins have been subject to decades, if not centuries, of international circulation, Sayles and the Guild believed that it would be specious to assert that broad categories of coins belonged to a particular country.

Second, Sayles and the Guild feared that coin collectors would be unable to comply with the CPIA's evidentiary requirements for importation. For example, they asserted that it would be difficult for an importer to obtain a certificate from a foreign country — that is, the certificate required by 19 U.S.C. § 2606(b)(1) — demonstrating that a particular coin had been lawfully exported. In a similar vein, they believed that

---

[6] Numismatics has been defined as the "study or collection of coins, paper currency, and medals." *Numismatics*, New Oxford American Dictionary (2d ed. 2005).

9

importers would be unable to satisfy the "provenance" requirements of § 2606(b)(2). According to Sayles, a "huge majority" of collectible ancient coins have no provenance — or record of ownership — because "there's never been any desire really among collectors of ancient coins to maintain provenance of a coin that they bought for 10 or 15 or $20." *See* J.A. 664.[7] Sayles and the Guild ultimately believed that if coins became legitimate targets of CPIA restrictions, it would "destroy ancient coin collecting." *Id.* at 665.

Beginning in 2004, the Guild engaged in a lobbying campaign to thwart efforts by governments to impose import restrictions on ancient coins. The Guild, however, was unsuccessful in that endeavor. In 2007, the U.S. Department of State (the "State Department") agreed to a request by the Cypriot government to impose import restrictions on ancient Cypriot coins, including those minted during Cyprus's Hellenistic and Roman eras. Pursuant to the resulting Cypriot MOU, Customs promulgated a regulation — that is, the "Cypriot Designated List" — identifying the ancient Cypriot coins that are subject to import restrictions.[8] Two years later, in January 2009, the State Department entered into a separate MOU with China. Pursuant thereto, the United States

---

[7] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[8] The Cypriot Designated List restricted gold, silver, and bronze coins of Cypriot type, including but not limited to issues of certain ancient Cypriot kingdoms dating from the end of the 6th century B.C. to 332 B.C., issues of the Hellenistic period from 332 B.C. to approximately 30 B.C., and provincial and local issues of the Roman period from around 30 B.C. to 235 A.D. *See* Extension of Import Restrictions, 72 Fed. Reg. 38,470, 38,471 (July 13, 2007) (codified at 19 C.F.R. § 12.104g(a)).

agreed to impose import restrictions on Chinese coins minted during the Zhou through the Tang Dynasties, a period of approximately 2,000 years. Consistent with the Chinese MOU, Customs promulgated a "Chinese Designated List," specifying the restricted materials.[9]

The Guild opposed the Cypriot and Chinese MOUs, believing that State Department officials had acted in bad faith in adopting the import restrictions. That belief was bolstered by what the Guild perceived as failures of government officials to comply with the CPIA. To remedy those perceived failures, the Guild sought to have its grievances heard and resolved in the courts. The Guild therefore decided to manufacture litigation by deliberately importing restricted ancient Cypriot and Chinese coins into the United States. Once the coins were detained, the Guild planned to sue the federal agencies and officials responsible for imposing and enforcing the import restrictions. The Guild, however, was initially unsuccessful in its efforts to induce Customs to detain various imported coins. The Guild therefore enlisted the help of a British coin dealer, Spink & Son. Using the Cypriot and Chinese Designated Lists for guidance, Spink and the Guild located twenty-three Cypriot and Chinese coins that they considered likely to be detained by Customs.

---

[9] The Chinese Designated List restricted the importation of tool- and disc-shaped coins from the Zhou Dynasty, coins of the "ban liang" variety from the Qin Dynasty, coins dating from the Han through the Sui Dynasties, and coins deriving from the Tang Dynasty. *See* Import Restrictions Imposed on Certain Archaeological Material from China, 74 Fed. Reg. 2838, 2842 (Jan. 16, 2009) (codified at 19 C.F.R. § 12.104g(a)).

11

On April 15, 2009, Spink shipped the Cypriot and Chinese coins from London to Baltimore on a commercial airline flight. To support the Guild's scheme, Spink attached an invoice to the coin shipment that was designed to alert the Customs officers and result in detention of the coins. The Spink invoice specified that the shipment contained twenty-three coins, including seven coins derived from Cyprus's Hellenistic and Roman eras (the "ancient Cypriot coins"); nine coins — two of which were knife-shaped — derived from China's Zhou, Han, and Western Han dynasties (the "ancient Chinese coins"); and seven other Chinese coins that were unattributed to a particular era or dynasty (the "unattributed Chinese coins").[10] The invoice also reflected that each coin had "[n]o recorded provenance" and that each coin's "find spot" was "unknown." *See* J.A. 1164.

2.

On April 24, 2009, Customs officers in Baltimore detained Spink's shipment of coins. The Spink invoice identified the Guild as the recipient of the coin shipment. Customs therefore issued the Guild a Notice of Detention, which specified its reason for detaining the coins as "Cultural Property Import Restrictions per [19 U.S.C. § 2606]." *See* J.A. 1172. The Notice of Detention requested that the Guild supply Customs with a

---

[10] The Spink invoice reflects that two of the ancient Chinese coins were knife-shaped, and one was a spade-shaped coin. The invoice thus differs from the allegations contained within the forfeiture complaint, which mentions three knife-shaped coins. That discrepancy, however, is immaterial to this appeal.

"Certificate or evidence" demonstrating that the coins were being imported into the United States in compliance with the CPIA. *Id.*

In May 2009, the Guild's lawyer filed a response to the Notice of Detention with Customs, objecting to the seizure and detention of the coin shipment. By that response, the Guild contended that the "State Department promulgated the underlying regulations in an arbitrary and capricious manner and/or contrary to law." *See* J.A. 186. The Guild further asserted that — based on its reading of the CPIA — Customs officers were required to "trace the coins in question back to either China or Cyprus before they [could] be properly detained." *Id.* Finally, the Guild maintained that it was impossible to provide Customs with the requested certification or satisfactory evidence, and that the Guild wished to have its "views [tested] in [c]ourt." *Id.* at 187.

Nearly a year later, on February 11, 2010, the Guild filed a civil action in the District of Maryland, naming as defendants the State Department, Customs, and two government officials. The Guild's complaint challenged the detention of the Spink coin shipment and alleged that the government had violated the Administrative Procedures Act (the "APA"), as well as the Guild's First and Fifth Amendment rights. The Guild also contended that the defendants had exceeded their authority — that is, acted *ultra vires* — by imposing import restrictions on Cypriot and Chinese coins.

By Memorandum Opinion of August 8, 2011, the district court dismissed the Guild's claims. *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383 (D. Md. 2011). As relevant here, the court ruled that the State Department's actions were not reviewable in federal court under the APA. The court

13

further determined that the State Department had not exceeded its authority under the CPIA by effectively "barring the importation of coins with unknown find spots." *Id.* at 409. The court also ruled that Customs had neither violated the APA nor acted *ultra vires* by carrying out its duty to promulgate and enforce the Cypriot and Chinese Designated Lists. Finally, the court concluded that the Guild's constitutional claims were meritless.

3.

By our *Ancient Coin I* decision of October 22, 2012, we affirmed the district court's dismissal of the Guild's complaint. *See* 698 F.3d 171 (4th Cir. 2012). Our colleague Judge Wilkinson, writing for a unanimous panel, ruled that the State Department had not exceeded its authority when it agreed to impose import restrictions on Cypriot and Chinese coins. *Id.* at 179-81. More specifically, the *Ancient Coin I* decision carefully examined the State Department's activities leading to the promulgation of the Chinese Designated List and concluded that "there is no question that the State Department complied with CPIA procedures when it placed import restrictions on Chinese coins." *Id.* at 179. The decision deemed it unnecessary to conduct a similar analysis of the Cypriot Designated List, explaining that the "district court similarly found that the State Department complied with the statutory requirements in placing import restrictions on Cypriot coins." *Id.* at 180.

Our *Ancient Coin I* decision also rejected the Guild's contention that the defendants had acted *ultra vires* by imposing import restrictions on, and later detaining, the collection of coins that were not necessarily "first discovered within" Cyprus and

14

China. *See* 698 F.3d at 181-82 (quoting 19 U.S.C. § 2601(2)). In so ruling, we recognized that it was the duty of the State Department and CPAC to determine where certain materials were first discovered before placing them on a designated list. *Id.*

After ruling that the State Department and Customs had properly interpreted and applied the CPIA, the *Ancient Coin I* decision explained that the Guild would be entitled in a forfeiture proceeding to "press a particularized challenge to the government's assertion that the twenty-three coins are covered by import restrictions." *See* 698 F.3d at 185. The decision also explained the burden-shifting framework applicable in a forfeiture proceeding conducted pursuant to the CPIA. In such a proceeding, the government would bear the burden of establishing that the ancient coins had been "listed in accordance with [19 U.S.C. § 2604]." *Id.* (quoting 19 U.S.C. § 2610). In other words, the coins must have been "listed 'by type or other appropriate classification' in a manner that gives 'fair notice . . . to importers.'" *Id.* (quoting 19 U.S.C. § 2604). If the government satisfied its evidentiary burden in the forfeiture proceeding, "the Guild must then demonstrate that its coins are not subject to forfeiture in order to prevail." *Id.* (citing 19 U.S.C. § 1615).

## C.

### 1.

On April 22, 2013, the government filed in the District of Maryland the complaint that underlies this appeal, seeking forfeiture to the United States of the ancient Cypriot and Chinese coins. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D.

15

Md. Apr. 22, 2013), ECF No. 1 (the "Complaint").[11]  The Complaint alleges that the defendant coins "compris[e] archaeological material of China and Cyprus that is listed . . . as property subject to such import restrictions." *Id.* at 4.  The Complaint makes clear that the importer failed to supply the Customs officers with CPIA-compliant evidence. For example, the Complaint alleges that neither Cyprus nor China issued certificates or documentation confirming that the coins' exportation was not in violation of their laws. The district court thus issued a warrant for arrest in rem for the seized coins.  The Guild promptly filed a Claim of Interest in the defendant coins, pursuant to Supplemental Admiralty and Maritime Claims Rule G(5)(A) of the Federal Rules of Civil Procedure.

In June 2013, the Guild answered the Complaint, interposing twelve affirmative defenses and demanding a jury trial.  In the process, the government moved to strike portions of the Guild's answer, contending that several of the Guild's responses — including affirmative defenses — sought to relitigate issues that were resolved by the *Ancient Coin I* decision.  While the government's motion to strike was pending, the Guild amended its answer, identifying additional affirmative defenses and seeking to counter the motion to strike.  *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. Sept. 27, 2013), ECF No. 13 (the "Amended Answer").

---

[11] Before filing its Complaint, the government discovered that there was a discrepancy between the number of coins identified in the Spink invoice — twenty-three — and the number of coins detained by Customs — twenty-two.  The discrepancy relates to the number of ancient Chinese coins and is not pertinent in this appeal.

By Opinion and Order of June 3, 2014, the district court granted the government's motion to strike, applying it to the Amended Answer. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. June 3, 2014), ECF Nos. 22 & 23 (the "Strike Opinion" and "Strike Order," respectively). In so ruling, the court observed that "much of the [Amended Answer] and most if not all of the affirmative defenses seek to relitigate issues concerning the validity of the regulations and the government's decision to impose import restrictions on certain Cypriot and Chinese coins." *See* Strike Opinion 2. The court stressed that the *Ancient Coin I* decision "forecloses any further challenge to the validity of the regulations." *Id.* at 1.

Eight months after the district court struck the Amended Answer, the Guild filed a newly amended answer. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. Feb. 25, 2015), ECF No. 36 (the "Second Amended Answer"). In its Second Amended Answer, the Guild removed portions of its previous answer that had sought to relitigate *Ancient Coin I*. Despite those changes, the government moved to strike the Second Amended Answer. Although it noted that there "appear[ed] to be valid challenges to portions of the [Second Amended Answer]," the court denied the government's motion. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183, at 2 (D. Md. Feb. 11, 2016), ECF No. 63. Thus, the Second Amended Answer became the Guild's operative responsive pleading for the remainder of the forfeiture action.

2.

The parties began conducting discovery in March 2015, and several discovery issues were thereafter contested. In August 2015, the Guild sought to test the sufficiency

of the government's objections to certain requests for admissions. The Guild had requested, for example, that the government admit that, under the CPIA, it is only authorized to impose restrictions on objects of archaeological interest of a specific State Party "first discovered within" and "subject to the export control" of that State Party. *See* J.A. 172. The government objected, arguing that the Guild was seeking to expand the scope of the forfeiture action beyond the limitations imposed by the *Ancient Coin I* decision.

The Guild sought the depositions of two State Department officials, Andrew Cohen and Maria Kouroupas, along with the deposition of a Department-designated witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure. The Rule 30(b)(6) deposition sought information concerning eleven subjects, including the circulation patterns of Cypriot and Chinese coins; European Union and Chinese export control laws for cultural goods, including coins; and the drafting and meaning of the Cypriot and Chinese Designated Lists. In September 2015, the government requested a protective order barring the depositions of the State Department officials and substantially narrowing the Rule 30(b)(6) deposition. Thereafter, in October 2015, the Guild sought to compel responses to thirteen of its document requests and two sets of interrogatories, which related to the circulation of Cypriot and Chinese coins, foreign export control laws, and the drafting of the Cypriot and Chinese Designated Lists.

By Order of February 11, 2016, after considering the arguments of counsel, the district court ruled on the discovery motions. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. Feb. 11, 2016), ECF No. 63 (the "Discovery Order"). In its

18

Discovery Order, the court denied most of the Guild's discovery requests and granted the government's request for a protective order. The court primarily concluded that the Guild was seeking discovery on issues that were irrelevant to the forfeiture proceedings. *Id.* at 1-2 (emphasizing that it was "unlikely that the export control status of the coins under foreign law will be a proper defense in this forfeiture action"). The court also deemed most of the discovery sought from the State Department officials to be improper, explaining that it was "not so much factual as legal." *Id.* at 1.

The Discovery Order also addressed the Guild's repeated endeavors to pursue its contention that the government was obliged to prove "first discovery" as part of its prima facie forfeiture case. The district court concluded that the Guild's position in that regard was foreclosed by *Ancient Coin I*, but suggested that the Guild might be able to rebut a prima facie forfeiture case by demonstrating that "these specific coins were exported from their respective States before CPIA restrictions went into effect." *See* Discovery Order 1. The court also suggested that it might consider some expert testimony in that respect as pertinent.

In response to the Discovery Order, the Guild secured two experts. It retained an expert in numismatics, Douglas Mudd, and an expert in the international exchange of cultural artifacts, Michael McCullough. In his expert report, Mudd opined that based upon the mass circulation of Cypriot and Chinese coins outside modern borders, "it is impossible to assert that all such coins without provenance should be regarded as illegally exported cultural property." *See* J.A. 1040. McCullough opined in his expert report that, after assessing the applicable laws and regulations, "the export of [the] Cypriot coins at

19

issue from the United Kingdom was a legal export under European Union and hence Cypriot law" that should satisfy the CPIA's evidentiary requirements. *Id.* at 1052. McCullough also opined that "the Chinese coins at issue could have been exported from China's Free Port of Hong Kong legally without an export certificate." *Id.*

Notably, the Guild made several significant admissions during the course of the discovery proceedings. For example, it acknowledged that the seven ancient Cypriot coins identified in the Complaint appeared on the Cypriot Designated List. The Guild also admitted that the eight ancient Chinese coins identified in the forfeiture complaint appeared on the Chinese Designated List. Finally, the Guild admitted that it had "knowingly" and "purposefully" sought to import those fifteen coins into the United States, with full awareness that the ancient Cypriot coins and the ancient Chinese coins identified on the Spink invoice were subject to import restrictions imposed by the United States. *See* J.A. 1280. The Guild denied, however, knowing that the seven unattributed Chinese coins named as defendants in the Complaint were subject to import restrictions.

3.

After the close of discovery, the parties filed cross-motions for summary judgment. On March 31, 2017, the district court issued its decision resolving the parties' motions. *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. Mar. 31, 2017), ECF No. 83 (the "Forfeiture Opinion"). In conducting its forfeiture analysis, the court adhered to the burden-shifting framework identified in the *Ancient Coin I* decision. Pursuant thereto, the government was obliged to carry the initial burden of showing that the coins were "listed in accordance with section 2604." *See* Forfeiture

Opinion 15 (quoting *Ancient Coin I*, 698 F.3d at 185). However, the court concluded that the *Ancient Coin I* decision had already determined that the government had properly promulgated the Cypriot and Chinese Designated Lists, in accordance with § 2604 of Title 19. Thus, the government's remaining burden in the forfeiture proceedings was to prove that "each of the 22 coins falls into the 'type or other classification' of material included in the designated lists." *Id.* at 15.

In the Forfeiture Opinion, the district court ruled that the government had satisfied its burden with respect to the seven ancient Cypriot coins and the eight ancient Chinese coins. As the court explained, the Spink invoice and the Guild's own admissions established that the fifteen coins were of "restricted types." *See* Forfeiture Opinion 16. By contrast, neither the government nor the Guild introduced any evidence establishing that the seven unattributed Chinese coins matched the materials on the Chinese Designated List. The court therefore awarded summary judgment to the Guild as to the seven unattributed Chinese coins.

With regard to the fifteen contested Cypriot and Chinese coins, the Forfeiture Opinion explained that the burden shifted to the Guild to rebut the government's initial showing. The Guild thus had "to [either] establish, by a preponderance of the evidence, that the property is not subject to forfeiture, or . . . establish an applicable affirmative defense." *See* Forfeiture Opinion 18 (quoting *United States v. Eighteenth Century Peruvian Oil*, 597 F. Supp. 2d 618, 623 (E.D. Va. 2009)). In order to satisfy that burden, the Guild sought to utilize its expert evidence. The government objected, however,

21

arguing that the Guild was confined by statute to the three forms of documentation specified in § 2606(b)(1)-(2) — which the Guild conceded it could not produce.

The district court then declined to rule on the propriety of the Guild's use of its expert evidence, explaining that the government was entitled to judgment as a matter of law regardless of whether Mudd's and McCullough's opinions were proper CPIA evidence. As the court explained, Mudd's expert testimony — which the Guild relied on to prove that it was "more probable than not that the Spink coins left Cyprus and China hundreds or thousands of years ago as currency, or decades ago as collectables" — was insufficiently particularized to the defendant coins to rebut the government's prima facie case. *See* Forfeiture Opinion 22. In so ruling, the court emphasized that the Guild had identified "no authority for the position that a CPIA forfeiture claimant may rebut the government's prima facie case with general evidence regarding a *type* of restricted material." *Id.* The court emphasized that Mudd's expert evidence was essentially an effort to second-guess the State Department's and CPAC's decision to impose import restrictions on certain ancient coins. As such, the court determined that the expert opinions of Mudd failed to create an issue of material fact, and the court refused to sanction the Guild's effort to "undermine the function of the designated lists." *Id.*

The district court also concluded that McCullough's expert testimony was deficient for a number of reasons. First, the court explained that McCullough's expert evidence — which was offered to show that the defendant coins had been lawfully exported from their respective State Parties — was not in the form contemplated by the CPIA. To demonstrate compliance with a State Party's laws, the CPIA requires a

certificate or other documentation "from the State Party" that had requested the import restrictions. *See* Forfeiture Opinion 23-24 (citing § 2601(a), (b)(1)). However, the Guild offered neither a certificate nor other documentation from Cyprus or China. Second, the Forfeiture Opinion observed that McCullough's testimony suggested that the Cypriot coins were lawfully exported from the United Kingdom, rather than from Cyprus. But the CPIA directs that evidence of a lawful export must come from the country that requested the import restriction, in this case Cyprus. Third, the court emphasized that McCullough's opinions suggested only that the Chinese coins "*could* have been lawfully exported" from China — not that they actually *had* been lawfully exported from China. *Id.* at 26-27 (emphasis original). That evidence thus suffered from a lack of particularity and was incongruous with the CPIA requirements. Based upon those shortcomings, the district court ruled that the Guild was unable to rebut the government's prima facie case for forfeiture.

Finally, the Forfeiture Opinion rejected the Guild's due process claims, as well as the Guild's request that the district court reconsider several earlier rulings. The district court characterized the Guild's two due process claims as impermissible efforts to relitigate issues that we resolved five years earlier in the *Ancient Coin I* decision. Regardless of the previous litigation, the court explained that the Guild's constitutional claims lacked merit. The court thus awarded summary judgment to the government as to the fifteen ancient coins, that is, the seven Cypriot and eight Chinese coins.

The Guild has timely appealed the judgment of forfeiture of the fifteen coins to the United States. We possess jurisdiction pursuant to 28 U.S.C. § 1291.[12]

## II.

The Guild challenges the district court's judgment on multiple grounds. First, the Guild contends that the court erred in the Forfeiture Opinion by failing to require the government to prove all the elements of its forfeiture case. Second, the Guild argues that the court abused its discretion in the Forfeiture Opinion when it rejected the Guild's expert evidence. Third, the Guild maintains that the court erred in ruling that the Guild had not been deprived of its right to fair notice of the ancient coins that were subject to import restrictions imposed by the government. Fourth, the Guild maintains that, in the Discovery Order, the court abused its discretion by declining to authorize several discovery requests. Fifth, the Guild argues that the court abused its discretion in the Strike Opinion and Order by striking certain affirmative defenses and other aspects of the

---

[12] Cabined within a footnote in its opening appellate brief, the Guild suggests that this Court may lack jurisdiction. The Guild asserts that the district court's rulings "raise the specter that CPIA forfeiture actions fall under the Court of International Trade's 'embargo jurisdiction.'" *See* Br. of Appellant 16 n.4. Relying only on a single law review article, the Guild maintains that the "embargo jurisdiction . . . would divest this Court's jurisdiction." *Id.* In its brief's statement of jurisdiction, however, the Guild contends that there was jurisdiction in the district court and that jurisdiction exists in this Court. We agree that the district court possessed jurisdiction over the forfeiture proceedings under 28 U.S.C. §§ 1355(a), 1356, and that we possess final order jurisdiction pursuant to 28 U.S.C. § 1291. Therefore, insofar as the Guild pursues a jurisdictional challenge, we reject it.

24

Guild's Amended Answer. Notably, the Guild supports its third and fifth contentions with constitutional arguments.[13]

We review de novo a district court's award of summary judgment, "viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." *See Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013). An award of summary judgment is only appropriate if the record demonstrates that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The applicable standard of review for an evidentiary ruling is the abuse of discretion standard. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-41 (1997). We will also review a decision to strike a party's pleadings — or portions thereof — for an abuse of discretion. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 702 (4th Cir. 2007) (en banc); *see also Hatchett v. United States*, 330 F.3d 875, 887 (6th Cir. 2003). Because a constitutional question is a legal issue, we review the district court's ruling de novo. *See United States v. Dinkins*, 691 F.3d 358, 382 (4th Cir. 2012).

---

[13] Although the Guild characterizes each of its contentions of error as a violation of the Guild's constitutional rights, substantive constitutional arguments underpin only its third and fifth contentions. With respect to the other contentions of error, the Guild provides no more than brief, conclusory statements that its constitutional rights were contravened. We are satisfied to reject the unsupported constitutional arguments due to insufficient briefing and lack of merit. *See Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997) (ruling that issue raised but not briefed was waived); *see also Bronson v. Swensen*, 500 F.3d 1099, 1104-05 (10th Cir. 2007) (recognizing that appellants forfeited constitutional argument by inadequate briefing).

### III.

Before specifically addressing the Guild's appellate contentions, some background concerning federal forfeiture proceedings is warranted. Most civil forfeiture actions in the federal courts are governed by provisions of the Civil Asset Forfeiture Reform Act (the "CAFRA"). *See* 18 U.S.C. § 983. Pursuant thereto, the government has the initial burden to establish "by a preponderance of the evidence that the [disputed] property is subject to forfeiture." *Id*. § 983(i)(2). Section 983(i)(2) of Title 18, however, excludes certain other statutory provisions from CAFRA's application, including all forfeiture proceedings conducted under Title 19, in which the CPIA has been codified. *Id.* § 983(i)(2)(A). Forfeiture proceedings arising under the CPIA are thus governed by § 1615 of Title 19.

Although § 1615 places the initial burden of proof in Title 19 forfeiture proceedings on the *claimants* of the disputed goods, § 2610 — which governs CPIA forfeiture proceedings — places the initial burden of proof on the government.[14] The parties disagree, however, on what the government must demonstrate to carry its burden.

---

[14] Section 2610 of Title 19, which places the burden of proof on the government in these proceedings, specifically provides as follows:

> Notwithstanding the provisions of [§ 1615], in any forfeiture proceeding brought under [the CPIA] in which the material or article, as the case may be, is claimed by any person, *the United States shall establish* . . . in the case of any material subject to the provisions of [§ 2606], that the material has been listed . . . in accordance with [§ 2604].

19 U.S.C. § 2610 (emphasis added).

26

With that legal landscape in mind, we turn to an assessment of the Guild's various contentions of error.

A.

In its initial appellate contention, the Guild maintains that the district court erred in failing to require the government to prove two essential elements of its prima facie forfeiture case. According to the Guild, the government was obliged to prove that the ancient Cypriot and Chinese coins were (1) first discovered within and hence subject to the export control of the State Party for which restrictions were granted ("first discovery"); and (2) illegally removed from the State Party's control after those restrictions were granted ("illegal removal"). *See* Br. of Appellant 21. The Guild contends that the government has not and cannot satisfy either of those requirements.

The government counters that it had to prove — pursuant to § 2610 — only that a particular seized item was "listed in accordance with section 2604." *See* Br. of Appellee 46 (quoting 19 U.S.C. § 2610). It argues that to be "listed in accordance with section 2604" has only two requirements, namely that the seized material has been (1) listed by type or other appropriate classification, and (2) listed in a manner that gives fair notice to importers. The government asserts that it satisfied each of those requirements, and thus proved that the fifteen coins were "listed in accordance with section 2604."

As explained below, we reject the Guild's contentions with respect to the first discovery and illegal removal elements. We agree that the district court properly determined that the government had satisfied its burden with respect to the fifteen ancient Cypriot and Chinese coins at issue in these forfeiture proceedings.

27

1.

The Guild premises its contention that the government must satisfy the first discovery element upon two assertions about the CPIA — but only one of those assertions is accurate. The Guild correctly stresses that, under the CPIA, the executive branch can only impose restrictions on archaeological or ethnological material that was first discovered within the State Party that requested the restrictions, i.e., the State Party's cultural patrimony. The Guild is incorrect, however, in asserting that the government must prove the first discovery element at every stage of the CPIA process — initially in the promulgation of the designated lists, then in the detention of the restricted items by Customs, and again as part of establishing a prima facie forfeiture case.

The Guild wrongly conflates two statutory terms of art used in the CPIA — "archaeological . . . material of the State Party," as defined by 19 U.S.C. § 2601(2), and "designated archaeological . . . material," as defined by § 2601(7). Contrary to the Guild's erroneous reading of the CPIA, the first discovery requirement only delimits what material the executive branch can place on a restricted list. Once the material is properly included on a list, or, in other words, "designated," the government no longer must establish the first discovery element with regard to particular imported material.

The CPIA uses the term "archaeological material of the State Party" — which expressly incorporates the first discovery element emphasized by the Guild — when specifying the duties of officials in creating a designated list of restricted materials. *See* 19 U.S.C. § 2601(2). For example, when CPAC is presented with a request from a State Party to impose import restrictions, CPAC must prepare a report detailing the

28

"archaeological . . . material of the State Party" that should be subject to import restrictions. *Id.* § 2605(f)(4)(B). The President, in turn, is authorized to enter into an MOU that imposes import restrictions on "archaeological . . . material of the State Party" that made such a request. *Id.* § 2602(a)(2). Finally, after an MOU has been entered into, the CPIA requires the appropriate agency to promulgate a regulation listing the "archaeological . . . material of the State Party" that is covered by the MOU. *Id.* § 2604.

In the *Ancient Coin I* litigation, we examined whether the State Department, CPAC, and Customs had carried out their responsibilities in accordance with the CPIA, and we ruled that those responsibilities were executed properly. *See* 698 F.3d at 181. Our decision explained that the State Department and CPAC had appropriately taken into account where ancient coins were typically "first discovered" before deciding that Cypriot and Chinese coins comprised part of those State Parties' respective cultural patrimonies. *Id.* at 182. Judge Wilkinson's opinion specified:

> CPAC and the Assistant Secretary [of State] did consider where the restricted types may generally be found as part of the review of the Chinese and Cypriot requests. [Customs] listed the articles in question in the Federal Register by "type" — but only after State and CPAC had determined that each type was part of the respective cultural patrimonies of China and Cyprus. . . . Plaintiffs have given us no reason to question CPAC's conclusion, as adopted by State, as to where the types of cultural property at issue were discovered. To the contrary, it was hardly illogical for CPAC to conclude that, absent evidence suggesting otherwise, Chinese and Cypriot coins were first discovered in those two countries and form part of each nation's cultural heritage.

*Id.* Thus, in *Ancient Coin I*, we decided that the government had properly listed the Cypriot and Chinese coins, having satisfied the first discovery element.

To the extent the Guild seeks to revisit the *Ancient Coin I* ruling, we lack any authority to do so. Put succinctly, it is a basic principle of our Court that "one panel cannot overrule a decision issued by another panel." *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). In that regard, it is also notable that the Guild unsuccessfully petitioned for rehearing and then for certiorari, all to no avail. With the propriety of the Cypriot and Chinese listings decided in the previous litigation, all that remains in this matter is whether the coins in question constitute "designated archeological material" subject to forfeiture.

As noted, the CPIA uses the defined term "designated archaeological material" — which does not contain the first discovery element — in describing the responsibilities of federal officials *after* import restrictions have gone into effect, i.e., after ancient coins have been placed on a "designated list." *See* 19 U.S.C. § 2601(7). Thus, Customs is tasked with preventing the "designated archaeological . . . material" from entering the United States without adequate documentation. *Id.* § 2606(a). Furthermore, when a determination has been made by Customs that "designated archaeological . . . material" was sought to be imported in violation of § 2606, the government is obliged to initiate an appropriate forfeiture action. *Id.* § 2606(b); *see also id.* § 2609. Finally, during the forfeiture proceedings, the government's initial burden of proof is simply to demonstrate that "material subject to the provisions of section 2606" — that is, designated archaeological material — is listed "in accordance with section 2604." *Id.* § 2610.

The crux of the Guild's incorrect interpretation of the CPIA appears to emanate from the "in accordance with section 2604" language. *See* 19 U.S.C. § 2610(1). In

addition to directing the executive branch to promulgate lists of restricted material, § 2604 also imposes minimum drafting standards for those lists. It provides that each listing "shall be sufficiently specific and precise to ensure [both] that [the restrictions] are applied only to the archeological and ethnological material covered by the agreement" and that importers have fair notice regarding what material is subject to those restrictions. *Id.* § 2604. However, our *Ancient Coin I* decision foreclosed a subsequent challenge to whether Cypriot and Chinese coins were "listed in accordance with section 2604." *See* 698 F.3d at 183 ("Here, CBP has listed the Chinese and Cypriot coins by type, in accordance with 19 U.S.C. § 2604 . . . ."). Instead, in the forfeiture proceedings, the government had to demonstrate that the particular coins in question fall under the type described in the listing.

Even absent the rulings in *Ancient Coin I*, however, we do not read § 2610, incorporating § 2604, to require the government to establish first discovery in order to carry its initial burden in a forfeiture action. As explained in *Ancient Coin I*, Congress drafted the CPIA in an effort to balance procedural efficiency with procedural recourse. *See* 698 F.3d at 181. Additionally, we explained in *Ancient Coin I* that second-guessing the executive branch's international negotiations regarding issues of cultural heritage is generally beyond the purview of the federal judiciary. *Id.* at 179. Given that context, we will not engage in "a searching substantive review of . . . diplomatic negotiations or [the] application of [ ] archaeological expertise." *Id.* Therefore, we must read and apply the CPIA in light of that approach.

31

The second sentence of § 2604 requires the government in a forfeiture action to demonstrate that the listed, restricted material is "covered by" the relevant MOU. The first requirement of that sentence does not oblige the government to establish that the material at issue was "first discovered" within the relevant State Party. To rule otherwise would both necessitate a "searching substantive review" of international negotiations, which is an inappropriate exercise for the courts, and undermine our controlling construction of the CPIA. *See Ancient Coin I*, 698 F.3d at 179.

Notwithstanding the foregoing, the Guild would have us rule that Congress's use of the term "designated archaeological material" with respect to the designated lists — rather than, for example, the term "archaeological material of the State Party" — was the result of poor drafting. The Guild would also have us rule that Congress actually intended for government officials and the federal courts to treat the two terms as identical. We readily reject that request. It is axiomatic that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) (alterations and internal quotation marks omitted). The CPIA prescribes that "archeological material" refers to what may be listed, and that "designated archeological material" describes what has been listed. This temporal distinction supplies the controlling, meaningful difference between the two terms of art contained within the CPIA.

32

Here, Congress's use of the term "designated archaeological material" absolves the government from the need to again prove the first discovery element after properly promulgated import restrictions have gone into effect. If that were not the case, the importers — such as the Guild — could always relitigate the State Department's conclusions that certain materials belong to a particular country's cultural patrimony. And that is precisely what the Guild seeks to do in this forfeiture action. As we recognized in *Ancient Coin I*, however, the determination of where certain types of archaeological materials are typically discovered is beyond the competence of the federal courts. *See* 698 F.3d at 179 ("The federal judiciary has not been generally empowered to second-guess the Executive Branch in its negotiations with other nations over matters of great importance to their cultural heritage.").

Consistent with the foregoing, the issue pursued by the Guild regarding first discovery is resolved by the designated lists in the regulations — and need not be relitigated in a forfeiture action. We therefore reject the Guild's contention that the district court erroneously excused the government from proving first discovery as an essential element of its prima facie forfeiture case.

2.

As a part of its initial contention of error, the Guild also maintains that the government failed to establish that the fifteen ancient coins were illegally removed from Cyprus or China. This argument is predicated on the fact that the CPIA does not bar importation of all "designated archaeological or ethnological material," but rather only designated material that has been "exported . . . from the State Party after the designation

33

of such material under section 2604," without "documentation which certifies that such exportation was not in violation of the laws of the State Party." *See* 19 U.S.C. § 2606(a). As with the first discovery requirement, the Guild contends that the government had to prove the illegal removal element as part of its prima facie forfeiture case.

Simply put, we reject the Guild's interpretation of the CPIA on this point. As we explained in *Ancient Coin I*, Congress anticipated efforts to import archaeological material "without precisely documented provenance and export records." *See* 698 F.3d at 182. In those circumstances, the CPIA does not require the *government* to produce evidence establishing the provenance or export status of the archaeological material. Rather, as *Ancient Coin I* recognized, when Customs has determined that the archaeological material "has been designated by 'type' and included in the list of restricted articles," § 2606 "expressly places the burden on importers to prove [the designated material is] importable." *Id.* at 182. The importer can satisfy that burden by presenting to Customs one of the three types of documentation specified in § 2606(b). *Id.* Unless the importer does so, however, Customs must "refuse to release the material from customs custody." *See* 19 U.S.C. § 2606(b).

The Guild maintains that *Ancient Coin I*'s reasoning does not apply because that decision dealt with an importer's burden in the context of a detention of coins, rather than a forfeiture action. There is nothing in the CPIA, however, that supports the notion that the government must establish the provenance of seized material — or more specifically, that the seized material was illegally removed from a specified State Party — in the forfeiture proceedings. The CPIA simply permits the authorities to commence forfeiture

34

proceedings under § 2609 if the importer fails to provide the documentation specified in § 2606(b). *See* 19 U.S.C. § 2606(b). And § 2609 provides that designated archaeological material imported "in violation of" § 2606 is "subject to seizure and forfeiture." *Id.* § 2609. Absent a clear directive from Congress that the government must prove the additional element of illegal removal in forfeiture proceedings conducted under § 2609 — but not in a § 2606 detention — we must reject the Guild's contention that the government failed to establish a prima facie forfeiture case.

3.

Although we reject the Guild's contentions with respect to first discovery and illegal removal, we recognize that 19 U.S.C. § 2610 imposes a substantial burden on the government in a forfeiture action. Indeed, the CPIA requires a multi-part inquiry before seized material is subject to forfeiture. As a preliminary matter, § 2610 requires the government to show that the seized material is "subject to the provisions of section 2606," i.e., that it is "designated archaeological or ethnological material." That showing requires the seized material to be "covered by an [MOU]" in force in the United States and "listed by regulation under section 2604." *See* 19 U.S.C. § 2601(7)(A)(i), (B). The government must then determine whether the seized material has been "listed in accordance with section 2604." *Id.* § 2610. To be so listed means that the pertinent designated list is "sufficiently specific and precise" to ensure that "the import restrictions under section 2606 . . . are only applied to the archaeological or ethnological material covered by the [MOU]," and that "fair notice is given to importers and other persons as to what material is subject to such restrictions." *Id.* § 2604.

35

Distilling the statutory requirements, the government must establish the following in order to meet its initial burden in a forfeiture action for material subject to § 2606 of the CPIA: (1) that the material is covered by an MOU, *see* 19 U.S.C. § 2601(7)(A)(i); (2) that the material is "listed by regulation under section 2604," *id.* § 2601(7)(B); and (3) that the listing is "sufficiently specific and precise" to ensure both that "the import restrictions . . . are only applied to the archeological or ethnological material covered by the [MOU]," and that "fair notice is given to importers and other persons as to what material is subject to such restrictions" *id.* § 2604.

The Forfeiture Opinion properly determined that the government had met its initial burden. The district court therein recognized that the first element of the CPIA forfeiture test was uncontested, i.e., that the seized ancient coins were covered by enforceable MOUs with Cyprus and China. *See* Forfeiture Opinion 15 ("There is no dispute that China and Cyprus are 'State Parties' under the CPIA . . . nor does the Guild deny that the United States has entered into an [MOU] with each under § 2602."). This forfeiture action is also distinguished by the fact that the *Ancient Coin I* decision already dispensed with the third element of the inquiry. More specifically, *Ancient Coin I* preempted further litigation of the validity of the Cypriot and Chinese Designated Lists, ruling that the Cypriot and Chinese coins were listed "in accordance with 19 U.S.C. § 2604." *See* 698 F.3d at 183. The government thus had only to prove the second element — that the Guild's coins were "listed by regulation under section 2604." *See* 19 U.S.C. § 2601(7)(B). And the government established that element. Indeed, the Guild conceded

36

the issue, admitting that the fifteen ancient Cypriot and Chinese coins matched coins on the Cypriot and Chinese Designated Lists.

The Forfeiture Opinion therefore properly concluded that the government had satisfied its initial burden in this case. As a result, the burden shifted to the Guild to prove that the fifteen ancient coins were somehow not subject to being forfeited to the United States.

## B.

In its second contention, the Guild maintains that the Forfeiture Opinion improperly precluded the testimony of its expert witnesses and the circumstantial evidence that could be derived from that testimony. The Guild contends that the district court erroneously required the Guild's expert evidence to be particularized as to the defendant coins. Assuming the particularization requirement, the Guild further argues that the expert opinions of Mudd and McCullough were sufficiently particularized and relevant to the forfeiture proceedings, and rebutted the government's prima facie forfeiture case. The government counters that the court properly addressed and discounted the experts' evidence, relying primarily on the reasoning of the Forfeiture Opinion.

As an initial matter, despite the Guild's characterization to the contrary, the district court did not expressly exclude the opinions of Mudd and McCullough. Instead, the court concluded that the evidence "[ran] contrary to the logic of the CPIA," and conflicted with the Guild's statutorily imposed evidentiary burden in the forfeiture proceedings. *See* Forfeiture Opinion 22. Additionally, the court ruled that the expert

37

evidence was "insufficiently particularized," such that it failed to "rebut the government's initial showing." *Id.* at 23, 27. We discern no abuse of discretion in the district court's treatment of the expert evidence. Further, we agree with the court that the expert evidence failed to create a disputed issue of material fact that rebutted the government's prima facie case.

We review a district court's decision on expert evidence for an abuse of discretion. *See United States v. Chikvashvili*, 859 F.3d 285, 292 (4th Cir. 2017). In evaluating the permissibility of expert evidence, a court assumes a "gatekeeping role," which guarantees that the expert opinions rest "on a reliable foundation and [are] relevant to the task at hand." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The Supreme Court has explained that relevance — or what has been called "fit" — is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the "the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591 (quoting former Fed. R. Evid. 702(a)). In reviewing a trial court's rulings on experts, we are mindful of the Supreme Court's admonition against "applying an overly stringent review . . . [that] fail[s] to give the trial court the deference that is the hallmark of abuse-of-discretion review." *See Joiner*, 522 U.S. at 143. And where a court relies upon expert evidence to determine whether a dispute of material fact exists, we review that determination de novo. *See Dash v. Mayweather*, 731 F.3d 303, 310-11, 316 (4th Cir. 2013). With those principles in mind, we turn to the Guild's contentions with respect to its proposed experts.

1.

The Guild maintains that the district court erroneously required the Guild's experts to present particularized opinions that would prove the fifteen defendant ancient coins were not subject to forfeiture. As the Guild emphasizes, the word "particularized" is not found in the CPIA. Furthermore, the Guild argues that — unlike the government's initial burden of proof — the CPIA does not specify the Guild's burden on rebuttal. *See* 19 U.S.C. § 2610. Rather, § 2609 provides that "[a]ll provisions of law relating to . . . forfeiture . . . for violation of the customs laws shall apply to seizures and forfeitures incurred . . . under [the CPIA], insofar as such provisions of law are applicable to, and not inconsistent with, the provisions of [the CPIA]." *Id.* § 2609(a). In the Guild's view, its burden was thus governed by § 1615, which "contemplates that a claimant in a court case will be able to use any admissible evidence or testimony to rebut any presumption that an article is subject to forfeiture." *See* Br. of Appellant 36.

Although the Guild's recitation of legal principles may be accurate, we discern no error in the district court's application of a particularization requirement to the Guild's expert evidence. As our *Ancient Coin I* decision explained, the CPIA requires an importer to establish the importability of designated archaeological material by reference to the "article in question." *See* 698 F.3d at 182 (citing 19 U.S.C. § 2606). More specifically, the importer must satisfy one of three statutory requirements — i.e., that the material was either "(1) lawfully exported from its respective state while CPIA restrictions were in effect; (2) exported from its respective state more than ten years

39

before it arrived in the United States; or (3) exported from its respective state before CPIA restrictions went into effect." *Id.* at 183.

Consistent with the foregoing, the district court required the Guild to tailor its expert evidence to the articles in question, i.e., the specific Cypriot and Chinese coins that the Guild sought to import. As explained in the Forfeiture Opinion, permitting the Guild to rebut the government's prima facie forfeiture case with generalized evidence about ancient coins would "run[] contrary to the logic of the CPIA." *See* Forfeiture Opinion 22. More specifically, such expert evidence would not assist the trier of fact in determining when the specific articles in question were exported from the particular State Party. Nor would it tend to prove that the articles were lawfully exported. Rather, generalized evidence could only serve to attack the legitimacy and logic of the pertinent designated lists in the regulations. And in these forfeiture proceedings, the legitimacy of those lists was no longer subject to challenge.

The district court's application of the particularization requirement thus ensured that the Guild's rebuttal expert evidence "fit" the questions presented in the forfeiture proceedings. *See Daubert*, 509 U.S. at 591. And that requirement barred the Guild from using expert evidence to undermine the legitimacy of the designated lists, and relying on evidence that is "inconsistent" with the CPIA. *See* 19 U.S.C. § 2609. The court therefore did not abuse its discretion by requiring the Guild to present expert evidence that was particularized to the fifteen defendant ancient coins.

40

2.

The Guild also contends that, assuming a "particularized evidence" requirement exists, the district court improperly discounted Mudd's testimony regarding the circulation patterns of ancient Cypriot and Chinese coins. *See* Br. of Appellant 39. In the Guild's view, Mudd's evidence was sufficiently particularized to address the question of whether the Guild's coins had been "exported from their respective states before CPIA restrictions went into effect." *See Ancient Coin I*, 698 F.3d at 183. The Guild also maintains that Mudd's testimony — combined with circumstantial evidence tending to show that the defendant coins had been exported soon after the import restrictions went into effect — would have been sufficient to rebut the government's prima facie forfeiture case.

We reject the Guild's characterization of Mudd's expert evidence. The record reveals that Mudd simply proffered generalized assertions about Cypriot and Chinese coins. For example, he opined that "it is impossible to pinpoint the site of origin of most Cypriot coins unless they were part of the small minority of pieces that [came] from properly recorded hoard finds." *See* J.A. 1041. With respect to Chinese coins, Mudd reported that "[i]n modern times, Chinese coins have been exported in huge numbers, just as they have been since at least the 7th century." *Id.* at 1040. In short, Mudd's expert evidence was not directed towards resolving the issues in this forfeiture proceeding, namely, determining the provenance and export status of the specific coins imported by the Guild. It instead sought to rehash the Guild's argument that the State Department had acted imprudently when it imposed import restrictions on ancient Cypriot and Chinese

41

coins. But the *Ancient Coin I* decision already disposed of that contention. Therefore, the district court neither abused its discretion by rejecting Mudd's testimony, nor erred by finding that Mudd's testimony failed to rebut the government's initial showing.

3.

In a related contention, the Guild argues that the district court improperly rejected and discounted McCullough's "particularized evidence" about the ancient Cypriot coins. The Guild offered McCullough's opinions to prove that the ancient Cypriot coins had been "lawfully exported from the State Party while the CPIA restrictions were in effect." *See* J.A. 1057. Specifically, McCullough opined that, based on his analysis of foreign law, "the export of Cypriot coins at issue from the United Kingdom was a legal export under European Union and hence Cypriot law that would satisfy the requirements of the [CPIA]." *Id.*

The government counters by emphasizing that McCullough's testimony would only show that the ancient Cypriot coins had been lawfully exported from the United Kingdom. The district court agreed with that contention and concluded that McCullough's testimony did not show that there was a lawful export "from the State Party" that had requested the restrictions. *See* Forfeiture Opinion 25 ("Under the CPIA, the relevant export is the original export from the State Party, not any subsequent export to a third country, even if the latter is the export that brought the material to the United States."); *see also* 19 U.S.C. § 2606(a). The court thus did not err in deciding that McCullough's opinions were irrelevant — and therefore insufficient to rebut the government's case — in these forfeiture proceedings.

42

C.

In its third contention of error, the Guild argues that the Customs regulation promulgated and codified at 19 C.F.R. § 12.104 — which governs the enforcement of CPIA import restrictions — irreconcilably conflicts with its statutory parent's requirements, which are found in 19 U.S.C. § 2601(2). And the Guild further argues that this purported conflict deprives an importer of fair notice of those specific items that are subject to the import restrictions.

1.

The purported conflict derives from the "Definitions" section of the CPIA, which defines the term "archaeological or ethnological material of the State Party" as

(A)    any object of archaeological interest;

(B)    any object of ethnological interest; or

(C)    any fragment or part of any object referred to in subparagraph (A) or (B);

which was first discovered within, and is subject to export control by, the State Party.

*See* 19 U.S.C. § 2601(2). As shown above, the "first discovered within" language modifies subparagraphs (A), (B), and (C) of § 2601(2). Section 2601(2) appears to explain that objects of archaeological or ethnological interest, or any fragments or parts thereof, must be "first discovered within" the State Party that requested the import restrictions, and were then subject to that Party's export control.

In contrast to the § 2601(2) statutory definition enacted by Congress, the "Definitions" provision in the related regulation, that is, 19 C.F.R. § 12.104(a), does not

43

segregate the words "first discovered within, and is subject to export control by the State Party" from the preceding subparagraphs. The regulation says:

(a)     The term, archaeological or ethnological material of the State Party
        . . . means —

    (1)     Any object of archaeological interest. . . .

    (2)     Any object of ethnological interest. . . .

    (3)     Any fragment or part of any object referred to in paragraph (a)(1) or (2) of this section which was first discovered within, and is subject to export control by the State Party.

*See* 19 C.F.R. § 12.104.

The Guild argues that the "first discovered within" clause of the regulatory definition therefore applies only to subparagraph (3) of 19 C.F.R. § 12.104(a). According to the Guild, the regulatory provision in § 12.104(a) suggests that fully intact archaeological or ethnological objects — as opposed to fragmented objects — are not subject to the "first discovered within" proviso. On the other hand, the statutory definition in § 2601(2) clearly provides that the "first discovered within" proviso applies to each category of object, regardless of whether an archaeological or ethnological object is fully intact or in fragments.

2.

a.

The Guild presses two arguments in connection with what it perceives as a fatal drafting error. First, it contends that the error in the regulation — § 12.104(a) — deprived the Guild of "fair notice" of those objects that are subject to import restrictions

44

under § 2604.  *See* Br. of Appellant 31-32.  Simply put, however, that contention misses the mark and must be rejected.  Section 2604's fair notice provision applies only to those regulations that "list [archaeological or ethnological] material by type or other appropriate classification," i.e., the designated lists.  *See* 19 U.S.C. § 2604.  The definitional regulation in § 12.104(a), which the Guild says deprived it of fair notice, is not a designated list.  To present a viable fair notice challenge under § 2604, the Guild would need to allege that either the Cypriot Designated List or the Chinese Designated List was insufficiently "specific and precise" to notify the Guild of what materials, such as ancient coins, were subject to the import restrictions.  *See id.*  Because no such allegation has been made, the Guild's statutory fair notice claim is fatally defective.

b.

In the second part of its fair notice contention, the Guild argues that it was unconstitutionally deprived of adequate notice that the Cypriot and Chinese coins were subject to import restrictions.  The Fifth Amendment's Due Process Clause, under which this contention is presented, requires that "a party must receive fair notice before being deprived of property."  *See United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997).  To provide notice that satisfies constitutional due process, a regulation "must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.'"  *See United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  As one circuit has aptly explained, a regulation

45

provides fair notice if it is "reasonably comprehensible to people of good faith." *See Gen. Elec. Co. v. Envtl. Prot. Agency*, 53 F.3d 1324, 1330 (D.C. Cir. 1995).

In the context of regulatory provisions, our 1997 decision in *Hoechst Celanese* is instructive. The EPA had pursued an enforcement action against an industrial plant for violations of regulations promulgated under the Clean Air Act. The regulations imposed emissions standards and reporting requirements on emitters of a pollutant called benzene. The plant owner, Hoechst, interposed a due process claim to the enforcement action. Hoechst contended that it was not subject to the EPA enforcement order because the EPA regulations failed to provide fair notice that Hoechst's plant had to comply with the benzene regulations.

Our *Hoechst Celanese* decision engaged in a fact-intensive inquiry, assessing the due process defense and explaining that it was "crucial to examine the particular situation of the defendant, and whether it lacked reasonable notice." *See* 128 F.3d at 224. That inquiry revealed that, for five years after the benzene regulations went into effect, Hoechst had not been fairly apprised of its obligations under the regulations. We emphasized that the benzene regulations were ambiguous and potentially supported Hoechst's interpretation of the contested regulations. More importantly, we recognized that the Hoechst officials had contacted the state regulators enforcing the benzene regulations seeking to determine whether they were in compliance, and that Hoechst had actually received an inaccurate response. We thus concluded that Hoechst could not be liable for its failure to comply with the benzene regulations during the period it lacked fair notice of its regulatory obligations.

46

The *Hoechst Celanese* inquiry, however, also revealed that five years after the benzene regulations went into effect, the EPA reached out to Hoechst and informed its officials how the EPA actually interpreted the regulations. That EPA communication provided "unequivocal, actual notice as to how the regulation[s] pertained to that plant's operations." *See* 128 F.3d at 229. Because Hoechst "well understood" that its interpretation and application of the benzene regulations conflicted with the EPA's interpretations, Hoechst was civilly liable for its post-notification violations of the benzene regulations. *Id.* at 227-30.

Like the defendant in *Hoechst Celanese*, the Guild has alleged an ambiguity in the federal regulatory scheme with respect to the defendant ancient coins that could confuse importers dealing with the designated lists. In contrast to Hoechst, however, the Guild has had actual notice — since at least 2007 — that its interpretation of the CPIA regulations is in direct conflict with that of the government. And the Guild has never made a good faith effort to comply with the applicable regulations. In fact, the Guild admits that it "deliberately" and "purposefully" imported the fifteen ancient coins, knowing that they were subject to import restrictions, in seeking to engineer this forfeiture action. *See* J.A. 1280. As such, the Guild cannot credibly claim that it has been unconstitutionally deprived of its property. The Guild simply implemented a scheme designed to knowingly contravene, and subsequently challenge, a federal law that it opposed.

In any event, the Guild's asserted conflict between the statutory definition in 19 U.S.C. § 2601(2) and the regulatory definition in 19 C.F.R. § 12.104(a) fails to make the

47

government's import restriction scheme so vague and ambiguous that a reasonable person would not know which ancient coins are subject to the restrictions. Indeed, the Guild concedes that it used the Cypriot and Chinese Designated Lists as guideposts in deciding which ancient coins were likely to be seized by Customs. The fact that the Guild — with the assistance of Spink — correctly identified the coins subject to the import restrictions, shows beyond peradventure that importers of ordinary intelligence are able to ascertain the conduct that contravenes federal law. In these circumstances, the Guild's due process rights were not violated and that aspect of its fair notice contention must also be rejected.

D.

Fourth, the Guild contends that the district court abused its discretion in declining to approve the Guild's efforts to conduct relevant discovery. In assessing the Guild's discovery arguments, we recognize that a trial court has "wide latitude in controlling discovery" and that discovery rulings are generally not overturned on appeal "absent a showing of clear abuse of discretion." *See Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003) (citations omitted). That latitude extends to "the manner in which [the court] orders the course and scope of discovery." *See Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986). We have acknowledged that it is "unusual to find an abuse of discretion in discovery matters," and such an abuse will only be identified where discovery restrictions prevent a litigant from "pursuing a [litigation] theory." *Id.* (citations omitted). With that standard in mind, we turn to the Guild's discovery contentions.

48

1.

The Guild initially maintains that the district court abused its discretion by failing to authorize discovery regarding, inter alia, "the circulation patterns of Cypriot and Chinese coins." *See* Br. of Appellant 34. The Guild argues that evidence regarding the circulation patterns of those coins was relevant to a proper assessment of whether the government had made a prima facie forfeiture case. The Guild also maintains that it was prejudiced by the denial of such discovery, in that the lack of discovery on circulation patterns "hampered the ability of the Guild's experts to issue complete reports." *Id.*

We are constrained to disagree with the Guild. The discovery materials that the Guild sought on circulation patterns could only be relevant if the government was required to prove first discovery as part of its prima facie forfeiture case. And we have already ruled that it did not have to prove first discovery. Assuming, however, that evidence of circulation patterns was somehow relevant to the forfeiture proceedings, the Guild was not prevented from pursuing that theory of defense. The Guild actually hired an expert in numismatics who emphatically maintained that ancient coins should not be considered as part of a country's cultural patrimony due to their historical patterns of circulation. The district court carefully considered that evidentiary submission by the Guild and rejected it. The Guild also fails to explain how its expert's opinions would have differed — or how the court might have made a different ruling — had the Guild obtained additional discovery regarding the circulation patterns of Cypriot and Chinese coins.

2.

The Guild next contends that it was unfairly precluded from essential discovery regarding "why the Guild's coins were detained and seized" and the "factual basis for seizure." *See* Br. of Appellant 34. As a preliminary matter, the Guild makes no effort to explain how the district court's purported error in this regard prejudiced the Guild's defense. Even ignoring that deficiency, however, the record belies the Guild's contention. The court provided the Guild with several opportunities to depose government officials and inquire into the circumstances surrounding the detention of the defendant ancient coins. For example, the Guild was allowed to depose Gerald Stroter, an import specialist who was present when the Guild's coins were detained, as well as Carlly Luckman, an Assistant Director at Customs, who gave a deposition as a Rule 30(b)(6) witness.

The district court only limited the Guild's access to that discovery after it became clear that the Guild was seeking testimony regarding legal impressions and conclusions from several government officials. As the court explained in denying further discovery under Rule 30(b)(6), "[t]he Guild primarily seeks information concerning the government's legal positions, which is generally beyond the scope of a proper [Rule] 30(b)(6) deposition." *See United States v. 3 Knife-Shaped Coins*, No. 1:13-cv-01183 (D. Md. June 1, 2016), ECF No. 71. In so ruling, the court conformed to the prevailing view of those courts that have dealt with litigants seeking to extract specific legal conclusions from government officials. *See, e.g.*, *ISI Corp. v. United States*, 503 F.2d 558, 559 (9th Cir. 1974) ("[O]pinions, conclusions and reasoning of government officials are not

50

subject to discovery."); *St. Matthew Publ'g, Inc. v. United States*, 41 Fed. Cl. 142, 147 (1998) ("In taking . . . deposition(s), plaintiff shall keep in mind that opinions, conclusions, and reasoning of government officials are not subject to discovery."). Put succinctly, we discern no abuse of discretion in any of the challenged discovery rulings. The Guild's contentions of error with respect to discovery are therefore also rejected.

E.

By its final contention, the Guild maintains that the district court acted improperly by striking the Amended Answer. We have not heretofore explicitly identified the applicable standard of review with respect to a district court's granting of a motion to strike pleadings. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 702 (4th Cir. 2007) (en banc) (concluding that "district court did not abuse its discretion in *denying* [motions to strike]" (emphasis added)); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (concluding that "the district court did not err in striking the Defendants' purported affirmative defense," but not expressly identifying the applicable standard of review). But several of our sister circuits have applied an abuse of discretion standard. *See, e.g.*, *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009) ("We review a district court's decision to strike for an abuse of discretion and will not disturb a decision that is reasonable and not arbitrary."); *Hatchett*, 330 F.3d at 887 ("We review the grant of a motion to strike a pleading for abuse of discretion."). In applying that standard, the Seventh Circuit explained that it would "not disturb a decision [to strike a counterclaim] that is reasonable and not arbitrary." *See Delta Consulting*

51

*Grp., Inc.*, 554 F.3d at 1141. Consistent therewith, we are satisfied to apply the abuse of discretion standard on this contention of error.[15]

### 1.

The Guild contends that the district court erred by striking its Amended Answer under Rule 12(f) of the Federal Rules of Civil Procedure. Pursuant to that provision, a trial court is entitled to strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *See* Fed. R. Civ. P. 12(f). The Guild maintains that the affirmative defenses stricken in this case did not fit within any of Rule 12(f)'s enumerated categories. Furthermore, the Guild argues that Rule 12(f) motions are viewed with disfavor "because striking a portion of a pleading is a drastic remedy." *See Waste Mgmt. Holdings*, 252 F.3d at 347.

Although the striking of a pleading can be a tough remedy, the district court did not abuse its discretion by granting the government's motion. In so ruling, the court was simply adhering to our *Ancient Coin I* decision. We therein acknowledged that, during an ensuing forfeiture proceeding, the Guild could "press a *particularized* challenge to the government's assertion that the twenty-three coins are covered by import restrictions." *See* 698 F.3d at 185 (emphasis added). The portions of the Amended Answer that were stricken by the district court, however, were not particularized to this forfeiture action.

---

[15] The Guild asserts that we should review de novo a district court's striking of a pleading. Supporting that contention, the Guild had provided a citation to our decision in *Waste Management Holdings*. As noted above, however, that decision did not expressly identify the appropriate standard of review for striking a pleading under Rule 12(f). *See* 252 F.3d at 347.

Rather, the stricken allegations sought to resurrect claims that the Guild had already lost in *Ancient Coin I*. For example, the court struck the following affirmative defenses:

- The Guild's defense that the import restrictions were "imposed without regard for the significant procedural and substantive constraints found in . . . CPIA," *see* Amended Answer 7;

- The Guild's defense that the "import restrictions on coins of 'Cypriot type' or 'from China' were the products of bureaucratic bias and/or prejudgment and/or *ex parte* contact," *id.*; and

- The Guild's defense that the government's forfeiture claims were barred by "fraud and illegality" based on the fact that "the State Department bureaucracy misled Congress and the public" on the recommendations of CPAC, *id.*

The *Ancient Coin I* decision had resolved those issues by ruling that the State Department and Customs had properly imposed import restrictions on ancient Cypriot and Chinese coins, in compliance with the CPIA. In this forfeiture case, the district court thus lacked the authority to question the validity of our earlier rulings. Similarly, we are bound by the rulings of our earlier panel decision. *See McMellon*, 387 F.3d at 332. Thus, the stricken defenses were not pertinent to this forfeiture action, and the court did not err in striking them.

2.

The Guild also presents its motion to strike contention with a constitutional hue as a violation of its due process rights. Relying on the Supreme Court's decision in *Degen v. United States*, the Guild contends that the ruling on the motion to strike deprived the Guild of the "right of a citizen to defend his property against attack." *See* 517 U.S. 820,

828 (1996). A review of the *Degen* case, however, reveals that the constitutional argument is also without merit.

In *Degen*, the government sought the forfeiture of multiple seized properties suspected of having been purchased with the proceeds of illegal drug transactions. *See* 517 U.S. at 821. Degen, as the claimant, had moved to Switzerland and refused to return to this country to face criminal charges. He did, however, file an answer in the civil forfeiture case. After the government moved to strike Degen's answer, the district court granted the motion to strike and awarded summary judgment to the government. The court explained that Degen was "not entitled to be heard in the civil forfeiture action because he remained outside the country, unamenable to criminal prosecution." *Id.* at 822.

Although the Ninth Circuit affirmed, the Supreme Court granted certiorari and reversed. *See Degen*, 517 U.S. at 822. Recognizing that the federal courts have "certain inherent authority to protect their proceedings," the Court ruled that the district court had nevertheless overstepped its authority and contravened Degen's due process rights by barring him from claiming and defending his property in the forfeiture action. *Id.* at 822-23. As the Court explained, "the sanction of disentitlement is most severe," and respect for the judicial system is "eroded . . . by too free a recourse to rules foreclosing consideration of claims on the merits." *Id.* at 828.

In stark contrast to the claimant in *Degen*, the Guild has not been disentitled from defending its property in a forfeiture action. In fact, the Guild was not even disentitled from pursuing the affirmative defenses stricken by the district court. In the *Ancient Coin*

54

*I* litigation, the district court and this Court each considered and rejected the Guild's claims regarding the propriety of the import restrictions imposed on ancient Cypriot and Chinese coins. Having already received two hearty bites at the proverbial apple, the Due Process Clause does not entitle the Guild to a third. The district court's conclusion in the Strike Opinion and Order thus did not violate the Guild's due process rights.[16]

IV.

Pursuant to the foregoing, we are satisfied to reject each of the Guild's contentions on appeal. We therefore affirm the district court's judgment of forfeiture.

*AFFIRMED*

---

[16] The Guild also maintains that we should be willing to revisit *Ancient Coin I* because the Cypriot and Chinese import restrictions were imposed in bad faith. More specifically, the Guild contends that the import restrictions resulted from a conspiracy between State Department officials, the archaeological community, and Goldman Sachs. We are satisfied to decline to revisit *Ancient Coin I* on that basis.